## THE MICHAEL TRACY.

### In re M. & J. TRACY, Inc.

### No. 357.

Circuit Court of Appeals, Second Circuit. Aug. 4, 1930.

William F. Purdy, of New York City (William F. Purdy and John E. Purdy, both of New York City, of counsel), for appellants Northwestern Fire & Marine Ins. Co., Switzerland General Ins. Co. of Zurich, Ætna Ins. Co., Globe & Rutgers Fire Ins. Co., and Providence Washington Ins. Co.

Barry, Wainwright, Thacher & Symmers, of New York City (Earle Farwell, of New York City, of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The steamship Michael Tracy collided with the steamship Cape Cod in Hell Gate on February 5, 1927. The latter was sunk, and her cargo became a total loss. The trial judge held that the sole cause of the collision was a sheer by the Cape Cod, and that the Michael Tracy was without fault. He accordingly exonerated the Michael Tracy from all damage arising out of the collision. The cargo underwriters contend that the finding of the trial court holding that the Michael Tracy was not at fault was erroneous, and on that ground have appealed.

The Michael Tracy was coming down the East River in ballast from Luysters Creek, Astoria, bound for Hampton Roads. The Cape Cod was proceeding up the river from Pier 32, East River, with a cargo bound for Connecticut ports.

At the time of the collision the dredge Governor Warfield was anchored on Middle Reef near Mill Rock in Hell Gate engaged in dredging operations. The channel between the Astoria shore and the dredge was approximately 600 feet wide. The weather conditions were perfectly normal, and the ebb tide was running at the rate of about three knots through Hell Gate.

The trial judge found that the collision occurred in the channel between the dredge and the Astoria shore at a point abreast of the dredge and about 150 feet off it; that those on board the Michael Tracy first observed the Cape Cod when the Michael Tracy had reached a position to the northward of and about 400 feet off Hallett's Point; that at this time the Cape Cod was between two and three hundred feet off the Astoria shore and about opposite the ferry slips at the lower end of Astoria Point; that at this time and in this relative position the vessels ex-

changed a one-blast signal and the Michael Tracy then starboarded in order to round Hallett's Point, and was planning to pass about 200 feet to the eastward of the dredge; that the Cape Cod continued her course up the river, and, when the vessels were between five and six hundred feet apart and still on their respective courses, the Cape Cod, which was then at a point a little below the dredge, took a sudden sheer and swung six or seven points to port across the course of the Michael Tracy.

The trial court further found, and this was admitted by the masters of both vessels, that, if the vessels had continued on their respective courses, they would have passed each other safely port to port with a distance of from one to two hundred feet between them; that the sheer was due to the sudden disablement of the Cape Cod's steering gear, but why it gave out, and what happened to it, were matters of surmise, for the Cape Cod sunk before any examination could be made of her and had not been raised.

The court further found that when the Cape Cod took the sheer to port she blew a two-blast signal, to which the captain of the Michael Tracy replied with two blasts, because, although he regarded a collision as then probably inevitable, he thought the only possible chance was for him to try to pass the Cape Cod on her starboard side.

The court further found that the Michael Tracy did everything she could have been expected to do in the emergency to avert a collision; that the ebb tide at that point in Hell Gate sets toward the place where the dredge was lying and would affect both vessels when they started to lose their way, as they did by reversing and backing in the hope to avert a collision.

The court further found that the Michael Tracy struck the Cape Cod a little abaft of her starboard bow, that the angle of the collision was about 30 degrees between the starboard sides of the two vessels, and that the Cape Cod sheered across the Michael Tracy's course.

■■ There is a practical acquiescence by all parties in the foregoing findings of the trial judge. The only thing to be added is that the Tracy on the one hand sought to establish that it was customary for all vessels to navigate on the east side of the dredge and that it was unsafe for vessels of the size of the Michael Tracy to go between the dredge and Mill Rock, and that the Cape Cod on the other hand called numerous witnesses to prove that she was suddenly disabled by driftwood that caught in her rudder so that it would not respond to the helm.

Article 25 of the Pilot Rules for Inland Waters provides that: "In narrow channels every steam-vessel shall, when it is safe and practicable, keep to that side of the fairway or mid channel which lies on the starboard side of such vessel."

John Reilly, a witness for the Michael Tracy, who was a government inspector at the dredge with the United States Army Engineers, testified that vessels usually passed down between the dredge and Astoria, but he added: "That he had seen all kinds of vessels take the course around Mill Rock and Ward's Island including a sound steamer." This testimony came from a witness who was familiar with the place and apparently totally disinterested. It conflicts with no finding of the trial judge, and not only shows that the Narrow Channel rule is frequently observed, as it should be, but that navigation to the west of the dredge is entirely practicable. It is familiar law that a custom cannot affect a valid regulation like Pilot Rule 25. We accordingly hold that the Michael Tracy, in coming down between the dredge and Astoria, was a wrongdoer because acting in violation of the regulation. She failed to bring herself within the exception in the rule, because it was undoubtedly "safe and practicable" to keep to the starboard side of the fairway.

Hell Gate is notoriously one of the most dangerous inland waters in the United States. This is attested by years of litigation over collisions which have occurred there. The inherent dangers of the spot were at the time of the collision magnified by the presence of the dredge, narrowing the channel between Mill Rock and Astoria to a width of only about 600 feet. Numerous litigations before the federal courts, as well as the proof in the case at bar, indicate the serious danger of the tidal currents, and the Regulations of the War Department show its care to make the narrow straits to the east and west of the dredge "one way" channels. These Regulations adopted by the War Department under statutory authority and in force when the collision occurred are, so far as pertinent, as follows:

"In pursuance of the foregoing law, the following regulations are prescribed to govern the use, administration and navigation of Hell Gate, East River, New York, for the purpose of preventing interference with the operations of the United States in widening and deepening the channel at Middle Reef. * * *

"7. During the continuation of work on Middle Reef, west-bound tows and car-floats, when going through the Gate at ebb tide, shall pass between Mill Rock and Wards Island, and around to the westward of Mill Rock; west-bound steamers proceeding under their own steam, or under their own steam assisted by tugs alongside, shall pass between the dredging plant on Middle Reef and Mill Rock or to the westward of Mill Rock."

We think the foregoing regulations can give rise to no direct liability on behalf of persons other than the government because they were in terms promulgated only for its benefit. St. Louis & San Francisco R. R. Co. v. Conarty, 238 U. S. 243, 35 S. Ct. 785, 59 L. Ed. 1290; Chicago Great Western R. R. Co. v. Schendel, 267 U. S. at page 291, 45 S. Ct. 303, 69 L. Ed. 614. But the regulations indicate the danger of using the easterly strait as a "two way" channel and the safety of coming down on the west of the dredge according to the opinion of a department having in its service men of technical training familiar with the conditions.

 Reilly, as well as other witnesses, testified to the presence of driftwood in the easterly channel, and gave some support to the claim of the witnesses for the Cape Cod that the dull thud under the stern of that vessel, accompanied by a noise like the crack of a pistol, and followed by the failure of the rudder to respond to the helm, was occasioned by contact of the rudder with a piece of this driftwood. But whether the sheer of the Cape Cod was due to what the trial judge, because he could not determine the cause, specified generally as the "sudden disablement of the gear," or to a log which put the rudder out of action, a sheer was one of those occurrences likely to happen in Hell Gate. The loss of control of the Cape Cod may have been partly due to the cause surmised or solely to the ebb tide that in some way caught her bow and swung it to port. It is both impossible and unnecessary for us to say which, for, as the trial judge said, she "sunk before any examination could be made and has not been raised." In either event, the tide swung her bow into the path of the Michael Tracy.

It is true that the mere violation of a statute or regulation adopted under statutory authority will not impose liability upon a tort-feasor if the violation is not a cause contributing to the injury. Long Island R. R. Co. v. Killien (C. C. A.) 67 F. 365; The Daniel McAllister (C. C. A.) 258 F. 549; The Waterford (C. C. A.) 6 F.(2d) 980. But here the violation of the rule did contribute to the injury, for it was the occasion of embarrassment of the Cape Cod in her attempt to pass up the easterly channel and make her landing at Astoria. It was shown that, if everything had worked well, there was room enough for the Michael Tracy to pass safely, but it might have been foreseen that the tides in Hell Gate not infrequently disturb calculations, so that vessels sheer. Vessels coming down through the Gate should in our opinion allow for such occurrences and obey the rule.

The rights or liabilities of the Cape Cod do not determine the liability of the Michael Tracy. The former may have been at fault for having defective gear which had not been properly maintained or inspected, or she may have been without fault because a log disabled her rudder. In the first case the Cape Cod could only recover half damages, but in the second case the Michael Tracy would be solely liable. Likewise under the familiar doctrine in admiralty, if the fault of the Cape Cod because she failed to act when she had plenty of time as well as space within which to navigate was very gross, the Michael Tracy, though herself a wrongdoer, would not be liable to the Cape Cod when the opportunity of the latter to escape was so great. But in none of these cases would the Michael Tracy be free from wrongdoing or from liability as a tort-feasor to the innocent owner of the cargo whose right the libelants here represent. The Beaconsfield, 158 U. S. 303, 15 S. Ct. 860, 39 L. Ed. 993. Any excuse which she might have does not apply to them.

We do not mean to say that there are not situations where the likelihood of damage because of the violation of the rule is not so remote that the owner of cargo should not be allowed to recover, even though his loss would not have happened but for the wrongful presence of the colliding vessel in the narrow channel. We hold that there is liability here because the likelihood of sheering was not so remote as to excuse the Michael Tracy for impeding the channel contrary to the rule.

Decree reversed with costs and cause remanded.