113

NEDERLANDSCHE INDISCHE TANK-
STOOMBOOT MAATS et al. v. STAND-
ARD OIL CO. (N. J.) et al.

THE THOMAS H. WHEELER.

ZIANGLING CHANG v. STANDARD OIL CO.
(N. J.).

Nos. 6835, 6845.

Circuit Court of Appeals, Fifth Circuit.
July 7, 1933.

Rehearing Denied Aug. 16, 1933.

In No. 6835:

Victor Leovy and Jas. Hy. Bruns, both of
New Orleans, La., for appellants.

William H. McGrann and Lucien V. Ax-
tell, both of New York City, and W. J. Wa-
guespack, H. W. Waguespack, and Charles
Austin O'Niell, Jr., all of New Orleans, La.,
for appellees.

In No. 6845:

W. J. Waguespack and Herbert W. Wa-
guespack, both of New Orleans, La., and Lu-
cien V. Axtell, of New York City, for appel-
lant.

William H. McGrann, of New York City,
and Charles A. O'Niell, Jr., of New Orleans,
La., for appellee.

Before BRYAN, SIBLEY, and HUTCH-
ESON, Circuit Judges.

HUTCHESON, Circuit Judge.

By these two appeals it is sought to re-
verse the decree of the District Court en-
tered in a cause of collision between the
steamships Silvanus, appellants owners, and
the Wheeler, appellee owner, which occurred
on the night of April 8, in the Mississippi
river, about forty miles below New Orleans.
They present for decision the correctness of
the finding of the District Judge that the
Wheeler is entitled to complete exemption
from liability as wholly without fault.

In support of his findings the District
Judge filed a comprehensive and thoughtful
opinion, in which the conflicting claims and
the testimony in support of them were an-
alyzed and appraised, and the conclusions
that he reached, the reasons he had for reach-
ing them, were set down with clearness and
precision. Fully recognizing the burden they
carry to overcome the effect of these findings,
counsel for appellants Nederlandsche et al.
have, with commendable diligence, resource-
fulness, and insight, put forward an analysis
of the testimony and of its effect, and a vig-
orous summary of the situation, which have
entirely stripped this appeal of all appear-
ance of perfunctoriness. With industry and
vigor to match, those for appellee have met
analysis with analysis, conclusion with con-
clusion, buffet with blow. The result has
been to make us feel that only upon a pains-
taking and careful thumbing of the thou-
sand pages of the record can we safely rest
our own determination.

The outstanding impression a first reading
of the record makes is that here is no case
of damage without fault. Here is a case the
contrary of that, of inexcusably faulty nav-
igation, on the part of one or both of the
ships involved. With a half mile wide river
to themselves, and with no apparent reason
for it, except the want of care, two ships, one
ascending, the other descending, come togeth-
er, with resulting destruction of life and
property, appalling in its nature and extent.
The ascending vessel, damaged indeed, but
with no loss of officers or men, comes to an-
chor near the place of collision. The other,
helpless, a mass of flames, without officers or
crew, swings now to the one, now to the other
side of the river, until it fetches up on the
bank some miles further down.

Because of the heavy loss of life on the
Silvanus, of those on the deck, only the mas-
ter was available to tell its side of the actual

happenings, while for the Wheeler the pilot, master, officers, and crew were all available, and many of them testified. In aid of its side of the case, the Silvanus offered the testimony of some six witnesses, who, because they saw the occurrence from the bank, have been referred to in the argument as "shore witnesses." In addition to these witnesses to the accident, there was testimony from the pilot and seamen on another ship, the Topa Topa, a descending vessel which had overtaken and passed the Silvanus shortly before and had met and passed the Wheeler just before the accident. There was, too, the testimony of the master of the Baja California, also a descending vessel, which following the Silvanus came upon the scene of the collision shortly after it had occurred. He testified that there was a thick fog, and that when he arrived on the scene just after the collision, the Silvanus "was in the river alongside of the East bank."

Appellants are very critical of the Wheeler's testimony, which the trial court adopted, that when the collision occurred she was preparing to anchor near the east bank. They are especially critical of the testimony of her pilot. They profess to see inconsistencies and improbabilities running through it all, which, considered in the light of the interest they had to exonerate themselves, give to the testimony of the Wheeler's witnesses a cast of unreliability disentitling it to credence. They oppose to the Wheeler's version of the occurrence a theory which they claim to circumstantially deduce from the facts in evidence, that whether for the purpose of anchoring, or in running the points, the Wheeler was at the time of the collision coming over from the east to the west bank, and that either getting out of control, or not seeing the Silvanus until too late, rammed her.

Upon the matter most testified to, where in the river the collision occurred, they scout as unreliable and inconsistent the testimony of the Wheeler's witnesses that it occurred near the east bank, and place their reliance upon the testimony of Visser, master of the Silvanus, that the collision occurred in the middle of the river, and of some of the shore witnesses, that it occurred there, or a little to the west of it. They minimize the effect of the testimony of those on the Topa Topa that just before the collision the Silvanus was coming on a slanting course across the river toward the Favret Light, by pointing to other testimony of those witnesses, that such a course was proper, and appraising that testimony as limited to the course of the Silvanus

and not at all fixing the place in the river where the collision occurred.

We have endeavored to give their due weight to all of these considerations. We realize that though it is perfectly obvious that some one blundered, it is natural that for results so dire, consequences so grievous, no one will be found willingly taking the blame. We realize also that though periods of excitement do tend to make upon the minds of ordinary untrained observers direct impressions of great vividness, they also tend to interrupt continuity of thought, and suspending the exercise of the faculty of reflection through which comparisons are made, and relations established, result in the creation of a series of isolated and independent impressions lacking sequence, continuity, and completeness. When later such observers are called upon to give a consecutive account of what occurred, it is almost inevitable that in their endeavors to piece together into an ordered whole having sequence and continuity, the isolated impressions which at the time the moving scene made, they will make this sequence up in part of things actually seen, in part of things not seen.

Just as truly as interest in a result, making thought wishful, tends to weave into the continuity of a complete narrative the substance of things hoped for, the evidence of things not seen, so untrained persons, who though having no interest whatever to serve, seeing things under excitement, have gotten only disconnected flashes of impressions wanting in continuity, when later called upon to give a connected story of what they saw, will almost inevitably use materials furnished by reflection upon the event, a blend of what they actually saw, with what in the light of what others have said about it, they imagine that they saw.

Fully conscious of these tendencies, we have, in our study of the case, and in an effort to appraise the testimony of those on the ships and those on shore to re-create the scene as it was in fact acted out, keeping these things in mind, checked and rechecked the story, each witness tells of the occurrence, against what emerges from the record as a whole, in the light of the inherent probabilities, as the whole record reflects them. In this view, if the case had to turn entirely on the testimony of those on the Wheeler that they were about to come to anchor when the collision occurred, we would not feel that in the light of the engine room records and of the testimony of those on her as to what was

then actually being done, this testimony could be fully accepted on its face. It might well be that because of the looming fog an intention to anchor had been conceived, and would shortly have been executed, for they were in the neighborhood of recognized anchoring ground. That, however, the plan for it had not only been conceived, but was in process of being executed when the collision occurred, considered by itself alone has more of the quality of an after-continuity than of a then matured and effected plan. In the same way the conflicting statements of those on the Wheeler, on the Silvanus, and on the shore, as to where the vessels were in the river when the collision occurred, must be discounted on their face for interest, for the exciting nature of the event causing great immediate and after comment and conjecture, for the simplicity and susceptibility to suggestion of some, in fact, of the greater part of the witnesses and for the fact that the testimony of most of the witnesses was taken some time after the collision.

When we turn from a consideration of the testimony of these witnesses to that of those on the Topa Topa, it seems to us that here is testimony perhaps most free from natural error, either of partisanship or unfamiliarity, and therefore the most valuable in determining where the truth of this case lies. We have examined it critically and carefully. We think it coincides with the inherent probabilities of the case as the whole record makes them out. We think it gives point and color to all the other testimony in the case, and that taken with that it furnishes the basis for a reasonable theory of what occurred. It points inescapably to the conclusion that the speed and course of the Silvanus in the fog caused the collision without any fault on the Wheeler's part.

In the light of the testimony of these witnesses, that of the master of the Silvanus that he was going straight down the river a little to starboard of the middle, and that the collision occurred because of the Wheeler's coming over there, seems incredible. In the light of their testimony, the confused statements of the shore witnesses, one putting the collision as occurring 200 or 300 feet off the east bank, some as occurring in the middle of the river, and others leaving it unclear as to where they thought it occurred, are deprived of significance and force. In this light, the testimony of those on the Wheeler that having decided to anchor, they had slowed down near the east bank, and were practically at a dead stop when the Silvanus ran across their bow, is

cleared of a partisan cast and takes on the color of truth and reality. In the light of their testimony, the exclamation of the pilot on the Silvanus, "What in hell are you doing here?" testified to by Visser, is significant, not as indicating that the Wheeler was making over to the west bank, but that the pilot, in slanting across the river in the fog, had lost his reckoning, and having because of the speed he was making, 13½ miles an hour over land, misjudged his own position and that of the Wheeler, was endeavoring to excuse himself for his predicament. This was given emphasis by the testimony of Visser that shortly before the collision he asked the pilot to swing nearer the west bank so that they could have more room, and that the pilot declined to do it, insisting that they had plenty of room where they were.

In the light of this testimony of the Topa Topa witnesses as to the slanting course of the Silvanus, of her speed into the thickening fog, the testimony of those on the Wheeler takes on the character of truth and conforms to the inherent probabilities of the case. Nothing in the testimony of those on the shore rebuts this view. They heard ships blowing, one thought them on the east side of the river, some in the middle. They did not, nor did any one else, see the Wheeler make the false maneuver which the appellants' argument requires it to have made. As it appears to us, the case may be thus briefly summarized:

On the night of April 8, 1926, the Dutch steamship Silvanus and the American steamship Wheeler were running the river, the Wheeler ascending, the Silvanus descending. Each for the greater part of its course was traveling to its starboard of the middle of the river. Shortly before the collision while still below Favret Light, and while the vessels were still some distance apart, the Wheeler came into a thickening fog. Because of it, she slowed down; her pilot deciding to anchor, orders were given to do so. Whatever the preparation for it, however, no anchor had been let down when the collision occurred. At this time the Wheeler was fairly close to her starboard bank, considerably nearer to it than to the middle of the river. The Silvanus coming down in a three-mile current under full speed, making overland 13½ miles an hour, undertook a slanting course across the river toward Favret Light when suddenly, in the fog, she found herself, too late to avoid collision, running across the Wheeler's bow.

Standing out sharply in this picture of

the collision is the speed of the Silvanus; standing out also is the thick fog, into which she came racing; standing out is the overwhelming weight of the testimony that the Wheeler was well on her own bank and practically still; standing out is the reckless conduct of the pilot in slanting across the river at full speed and in a thick fog, over the protest of the master.

The decree was right. It is affirmed.