THE Tug PERCHERON, her engines, furniture, apparel, etc., and Cornelius Kroll & Company, Appellants,

v.

ALABAMA TRANSIT COMPANY, Appellee.

No. 16587.

United States Court of Appeals Fifth Circuit.

July 16, 1957.

Chilton Bryan and E. H. Patton, Jr., Houston, Tex., and Benjamin Yancey, New Orleans, La., Terriberry, Young, Rault & Carroll, New Orleans, La., of counsel, for appellants.

Robert B. Acomb, Jr., Jones, Walker, Waechter, Poitevent & Denegre and A. J. Waechter, Jr., New Orleans, La., for appellee.

Before RIVES and CAMERON, Circuit Judges, and DAWKINS, Sr., District Judge.

DAWKINS, Sr., District Judge.

Appellants were the respondents in a suit in admiralty brought by appellee for damages growing out of a collision in the Intracoastal Canal at approximately Mile Post 45 west of Harvey in the Eastern District of Louisiana, between the lead of a two barge pusher type tow under the control of the Tug Percheron and its crew, and the one barge, similar type tow of the Tug Richard Z, belonging to appellee. Both had been moving in an easterly direction, and the latter tug was sunk by the stern.

The Court below found that "any fault on the part of the Richard Z was of such a minor nature that it would be completely outweighed by the negligence on the part of the Percheron", to the extent that the latter was "solely" responsible for the collision and resultant damages.

Appellant assigns as errors the holdings: (1) There was no actionable fault on the part of the Richard Z " * * * for remaining in a hazardous position in the Intracoastal Canal for an unwarranted length of time, and for failing to give proper signals or warnings to other vessels"; (2) " * * * for failure to keep a proper lookout"; but finding the Percheron at fault: (1) " * * * for failing to have a bow lookout"; (2) that she " * * * was an overtaking vessel and therefore had the burden of proving herself free from fault"; (3) that she " * * * was at fault for proceeding at a speed at which she could not be stopped within one half of the visible distance ahead"; and (4) " * * * in holding the sinking was not the result of inevitable accident."

(1) It is the contention of the appellant that " * * * the undisputed testimony established actionable fault on the part of the Richard Z * * * " even under the findings of the Court below. However, appellant concedes that " * * * on some points involved there are conflicts of testimony", but that the findings thereon " * * * are clearly erroneous." It also claims that because all of " * * * the testimony by the appellee was in the form of written depositions, while two of appellant's witnesses testified in person and one by deposition", the " * * * findings of the Trial Court are subject to modification in the sound judgment of the reviewing Court."

Appellant further asserts that the testimony of Captain Fikes, Master of the Richard Z, " * * * itself established fault", and " * * * in dealing with points involving conflicts in testimony with appellant's witness" it is "so conflicting and illogical as to be not worthy of belief." In support thereof appellant claims that the lower Court found that the position of the Richard Z, where it had been stopped for some twenty minutes, was with its bow, or front end of the barge, (220 feet long) twenty-five feet from the north bank of the canal, and the stern of the pushing tug (55 feet in length) seventy-five feet from that bank; that this finding was in accordance with testimony of the Master of the Richard Z, on direct examination; (the bow of the tug was fastened in a V shaped slot in the center of the stern of the barge for pushing) whereas, appellant points out that on cross-examination, the witness admitted these figures were based upon the positions of the vessels the following morning; and that when shown pictures of the Richard Z and its tow, Fikes stated the barge was "a good fifty feet" and the stern of the tug at least 100 feet from the north bank, or some 25 feet further toward the center of the canal. The evidence showed the canal was 300 feet wide at the point involved, which was some 200 feet from the south bank on the starboard side. (It was shown that somewhere in the vicinity of Mile

Post 45 there were anchored to the south bank one or more vessels estimated to extend some 75 feet toward the center of the canal. If the stern of the Richard Z was 100 feet from the north bank, being 15 feet wide, this would still leave 110 feet in approximately the center of the canal for the Percheron to pass. It was 24 feet wide, 81.1 feet long, and its barges 290.1 feet each by 50 feet in width, or a total length of 661 feet. Thus the Percheron's tow, with the maximum width of 50 feet had more than twice that distance to pass between the Richard Z and vessels anchored to the south bank, even if they were directly opposite each other.)

Under normal conditions of weather and ability to see, the "rule of the stream" like the rule of the road, required both of these flotillas going east to travel on the starboard side in a canal in which traffic moves both ways. However, due to fog and smoke from marsh fires, admittedly, there were times when visibility for each was practically zero, and this no doubt accounts for the fact that, at the time of the collision, both were on the north side of the canal.

Not only did these conditions of danger exist at the time, but the crew of the Percheron knew the Richard Z was ahead of it, for the obvious reason the latter had passed going east about 6:00 p. m. or almost four hours before the collision at approximately 9:55 p. m. It was conceded that when it got into a deep fog, the Richard Z informed the Percheron of the fact by radio, but there is a dispute as to whether there was a second message in which it was told that the Richard Z had stopped and was endeavoring to find a tree to tie to on the north bank. There is also controversy about the ability of those on the Richard Z to see either bank and objects thereon, but since the Percheron, itself, was in the north third of the canal's 300 feet, where west bound vessels could be expected, we think we must assume that

appellee's crew knew the "rule of the stream" which required it, " * * * when it is safe and practicable"[1] in traveling east, to stay on the south side of the canal, and the conclusion seems inescapable that the Richard Z and its tow were "lost" insofar as its location in the canal was concerned. If so, it appears to have done the reasonable thing in stopping, giving warning signals, and informing the Percheron by radio, as the lower Judge found had been done in a second message. Atlantic Refining Company v. Moller, 320 U.S. 462, 64 S.Ct. 225, 88 L.Ed. 168. The Master of the Richard Z was confronted with the fact that if he moved either to port or starboard, not knowing his position, he might find himself in the middle of the stream or in the path of traffic traveling one way or the other. In spite of such inconsistencies as may appear in the testimony of the appellee's witnesses, the law of self-preservation it seems would have impelled a retreat to and anchoring at the nearest bank as soon as it could be seen; and this strong circumstance also militates against an intentional, or even careless, wandering into the path of the obvious danger of west bound traffic. Had the Percheron, with a flotilla some 661 feet in length stopped when it found itself in a blinding fog, as the lower Court held the Richard Z had done, the collision would not have taken place. On the contrary, after entering the fog, the Percheron continued at a speed of $1\frac{1}{2}$ to $1\frac{3}{4}$ miles per hour, according to its own admission. After the collision, the proof showed, as found below, the Percheron tow traveled 435 feet before it was stopped, or more than two thirds its entire length, and in excess of one-half of the forward vision, contrary to maritime law. Pilot Rules for Inland Waters, Article 16, 33 U.S. C.A. § 192; The Umbria, 1897, 166 U.S. 404, 417, 17 S.Ct. 610, 41 L.Ed. 1053; Silver Lines, Ltd. v. U. S., 9 Cir., 1937, 94 F.2d 754, 1937 A.M.C. 1427;

1. Inland Rules, art. 25, 33 U.S.C.A. § 210. "In narrow channels every steam vessel shall, when it is safe and prac- ticable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

Eymard v. The Tug Bonnie Ruth, D.C. E.D.La.1954, 120 F.Supp. 67, 1954 A.M.C. 1186.

 The Percheron also failed to station a lookout at the bow of its 580 foot tow in a fog where the lower Court found visibility was practically zero, but depended upon what could be seen from the pilot house of the tug more than 580 feet further back. As the overtaking vessel, she bore the burden of proving herself free of fault. Pilot Rules of Inland Waters, Article 29, 33 U.S.C.A. § 221; Gulf Oil Corp. v. The Socony No. 16, 2 Cir., 1947, 162 F.2d 869, 1947 A.M.C. 1031; Pure Oil Co. v. The Vessel M/V Pennsylvania and Union Barge Line Corp., D.C.W.D.Ky.1955, 124 F.Supp. 121, 1955 A.M.C. 1116; Dick Towing Co. v. The Leo, D.C.S.D.Tex.1951, 98 F. Supp. 455, 1951 A.M.C. 1539.

There is some contention that the Percheron was not the overtaking vessel, but whether this was the situation or not, it is not denied the Richard Z had stopped some minutes before the forward barge of the Percheron's tow struck her a glancing blow at the stern and then continued on for the distance stated above. In such a collision the burden of proof is also upon the moving vessel. The Shinsei Maru, D.C.E.D.Va., 266 F. 548, 550.

Furthermore, while the pilot of the Percheron testified he was traveling at a speed of 1½ to 1¾ miles per hour, it was admitted the Richard Z passed at 6:00 p. m. at Mile Post 59, and the distance to the point of sinking, at 9:55 p. m. was approximately fourteen miles, thus indicating an average speed of more than three miles per hour by the Percheron, even allowing for any reduction after the latter ran into the fog, whether it was twenty minutes or something less than one hour, as some of appellant's witnesses testified.

We find ourselves impelled to agree with the Court below that, if there was any fault on the part of the Richard Z, it was of a minor nature, in no sense a proximate cause of the collision, but that the Percheron's negligence was such as to render it solely liable for the damages caused. The Great Republic, 23 Wall. 20, 90 U.S. 20, 23 L.Ed. 55.

Affirmed.