**O/Y FINLAYSON–FORSSA A/B, Finska Sjoforsakrings Aktiebolaget et al., Appellants,**

v.

**PAN ATLANTIC STEAMSHIP CORPORATION, claimant of THE S.S. ANTINOUS, and Det Forenede Dampskibselskab A/S, claimant of THE M/V ARGENTINA, Appellees.**

No. 17042.

United States Court of Appeals Fifth Circuit.

Aug. 1, 1958.

Henry J. Read, New Orleans, La., Bigham, Englar, Jones & Houston, Richard F. Shaw, Donald Waesche, Jr., New York City, for appellants.

John W. Sims, New Orleans, La., T. K. Jackson, Jr., Mobile, Ala., George W. Healy, III, New Orleans, for Pan-Atlantic S.S. Corp.

Jas. Hy. Bruns, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., Armbrecht, Jackson, McConnell & DeMouy, Mobile, Ala., of counsel.

Joseph M. Rault, Alfred M. Farrell, Jr., New Orleans, La., for Det Forenede, Dampskibselskab A/S. Terriberry, Rault, Carroll, Martinez & Yancey, New Orleans, La., of counsel.

Before RIVES, CAMERON and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

Cargo on the Danish M. V. Argentina sued the American S.S. Antinous, the non-carrying vessel, for cargo losses sus-

tained in the collision between the two vessels in the Mississippi River at about 0200 hours on April 10, 1952. After an extended trial and full arguments, the Court, on findings adopting almost altogether those physically prepared by the prevailing party in accordance with the local admiralty rules, held the carrying vessel solely at fault, the non-carrying S.S. Antinous not at fault, and accordingly dismissed Cargo's libel. Cargo, the only party both aggrieved and free to do something about it, alone appeals from this decree. The Antinous is satisfied, and if the Argentina is unhappy about the implications, not the precise holding which likewise frees her of indirect cargo liability, she has foreclosed her right to complain and makes no effort to do so here.

Cargo, with the irrepressible optimism, Higgins Inc., v. Hale, 5 Cir., 251 F.2d 91, 1958 A.M.C. 646, of their proctors who remember another day, seeks complete review and revision of nearly all of the critical fact findings, generally indifferent to the requirement of the new dispensation, McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20, 1954 A.M.C. 1999, that nowadays we can only reverse if the findings are clearly erroneous[1] under the concept of F.R.Civ.P. 52 (a), 28 U.S.C.A. judicially engrafted onto the admiralty procedure. We resist these importunities for in our disposition of the case we may accept the fact findings although we confess that were we unable to place our decision on the one principal point we would be hard put to accept several of them. Here and there, as we point out, the most favorable construction of the evidence considered most favorably to the decree nevertheless requires that we read the findings of estimates on speed, distance and time on the minimum, not the maximum, side.

Collision occurred at 0200 hours in a dense fog about one-half mile above Scarsdale Light and within 150 feet off of the East (right ascending) bank. The S.S. Antinous, upbound for New Orleans, partially loaded, was a C—2 vessel, 449 feet in length with 6,000 h.p. steam turbines and whose normal maneuvering speed was 14.2 KTW[2] at full ahead and 7.1 KTW at half ahead. The current of the river was running downstream at not less than 4 knots. The M.V. Argentina downbound from New Orleans substantially but not fully loaded and trimmed approximately two feet by the head, was a Danish cargo motor ship 350 feet in length with 3200 h.p. diesel motor and whose normal maneuvering speed was 13.5 KTW at full ahead, 9.5 KTW at half and 4.5 KTW at slow ahead. She was equipped with radar.

Scarsdale Light is about 2½ miles below Shingle Point at English Turn Bend. Coming downstream this is a sharp left bend. As a downbound vessel straightens up below English Turn Bend, she is on a course near 180 degrees. At a point about ¾ mile above Scarsdale Light the River bends slightly to the right (west) so that its axis is about 215° for a distance of over 2 miles which includes the area in which the significant maneuvers of the S.S. Antinous commenced. While the angle of convergence was slight, it may well have been the thing which set the stage for collision. As the M.V. Argentina was steering a compass course approximately 180° T and the S.S. Antinous was threading the stream parallel to the east bank, this could produce on the Argentina's radar screen the picture, if not carefully read, of a vessel approaching well off the Argentina's starboard bow. That is how the Argentina treated it, though mistakenly, for had collision not occurred, she would have shortly run aground on the east bank.

1. We have applied this many times: Green v. Crow, 5 Cir., 243 F.2d 401, 1957 A.M.C. 726; Ionion S.S. Co. v. United Distillers, 5 Cir., 236 F.2d 78, 1956 A.M.C. 1750; Societa Anonima Navigazione Alta Italia v. Oil Transport Co.,

5 Cir., 232 F.2d 422, 1956 A.M.C. 1073; C. J. Dick Towing Co. v. The Leo, 5 Cir., 202 F.2d 850, 1953 A.M.C. 498.

2. KTW = knots through the water. As later used, KOG means knots over the ground.

· At Collision Time [3] minus 18 minutes (C—18) the S.S. Antinous, when in the vicinity of the Seatrain loading docks and after running for some time at full

3. By synchronizing Antinous and Argentina time from the various bell and log books of the vessels, collision developed this way:

| | Antinous | | | Argentina | |
|---|---|---|---|---|---|
| | | | Synchronized | Bell Book and Time | |
| Bridge Time | | Bell Book Time | Collision Time | | |
| *0142 | Vis. becoming limited Fog Signals started | 0141+ Slow Ahead | C—18 | | |
| | Slow Ahead | | | | |
| | | | C—16 ½ | 0147½ | Full Ahead |
| | | | C—12 | 0152 | SS Antinous first seen on radar |
| | Antinous passed descending vessel abeam Scarsdale Light | | C—10 | 0154 | Half Ahead |
| | | | | | SS Antinous 2 pts. off Stb bow on radar |
| | | | C—7 | 0157 | Visibility reduced Heard fog signal from Antinous |
| | | | C—4 ½ | 0159½ | Sighted Antinous on radar 2 blast blown Half Ahead |
| | Heard 2-blast signal off port bow. Replied with danger signal Stop | 0158+ Stop | C—2 | 0202 | Blew second 2-blast |
| | | | | | Full Astern |
| | | | C—1 ½ | 0202½ | Full Astern emergency |
| | Danger signal heard from Argentina and second 2-blast. Replied danger signal and 3-blast reversing signal | 0159+ Full Astern | C—1 | 0203 | |
| | Full Astern | | | | |
| | First saw Argentina | | | | |
| *0200 | Stop Full Astern Hit Tanker Full Astern | 0200 At 0200 felt ship jar slightly | C | 0204 | Stop |
| | | | | | Hit by Antinous |
| *0201 | Slow Ahead | 0201 Stop Slow Ahead Stop | C+1 | | Stop |
| *0201.5 | Stop | | | | |
| | | | C+1 ½ | 0204½ | Half Ahead Stop |

*Entries as appear in Bridge Bell Book

ahead, reduced her engine speed to half ahead on account of fog closing in. She was then near the East (right ascending) bank and the Pilot,[4] after consulting with the Master who had been called to the bridge because of the fog, decided that the vessel should anchor but that it would be imprudent to do so until the vessel reached an anchorage just below Shingle Point approximately two miles above Scarsdale Light. She continued on at this speed and course blowing customary fog signals.

The first she knew of the downbound Argentina was at C—2 when a 2-blast signal, interpreted as a proposal for a starboard to starboard passage, was heard off the port bow, although the Argentina could not then be seen. All the Antinous' witnesses swore, although her logs do not bear them out, that she then immediately replied with a 4-blast alarm whistle and stopped her engines. Shortly thereafter and at C—1 she heard whistle alarms from the Argentina again followed by a 2-blast signal. At this moment the Argentina came into view for the first time about two ship lengths away. To this the Antinous responded with the alarm, put her engines on full astern (emergency) and blew the 3-blast reversing signal. Within the minute collision occurred. The angle of collision was about 70° with respect to the center line of the Antinous. The stem and bow of the Antinous penetrated 9 feet into the starboard side of the Argentina from below the waterline to weather deck at a point about 70 feet abaft her stem. Not surprisingly, the Antinous claims she was making sternway so that the collision force came entirely from the forward momentum of the Argentina.

Meanwhile, back on the Argentina, things were occurring. At C—16½ her engines were put on full ahead. At C—12 she saw on her radar for the first time an approaching vessel (this turned out to be the Antinous) bearing dead ahead or slightly off her starboard bow. At that time the Argentina was shaping up from 200–190° to her expected course of 180°. At C—10 fog became heavy and she reduced engine speed to half ahead. However, the bearing of the approaching Antinous had now changed to 2 points off the Argentina's starboard bow. This radar picture was misinterpreted and led the Argentina to assume that a starboard to starboard passage could be made. As fog became more dense, speed was reduced to slow ahead at C—7. At C—4½ when the Argentina heard, but ignored, a fog signal from the Antinous, her speed was increased to half ahead and shortly thereafter the masthead lights (but not the side lights) of the Antinous were observed bearing 20 to 25° off the starboard bow. About this time the Argentina blew a 2-blast[5] passing signal, not heard on the Antinous, and her course was probably altered a little more to the east by an easy left rudder order. Shortly before C—2 the Argentina again blew a 2-blast signal and on hearing the danger alarm from the Antinous at C—1½ the engines of the Argentina were put on full astern and held there until the collision moment.

On this the Court roundly condemned[6] the Argentina on several scores, all of which we accept as none are here challenged or open to review. At the same time the Antinous was exonerated of the

---

4. The Chief Officer was serving as Pilot under his Federal License.

5. Accepting the Antinous story of two separate series of 2-blast signals heard on the Antinous at C—2 and C—1, this means that three such signals were blown by the Argentina. The evidence to support this is doubtful and this lends credence to Cargo's charge that the Antinous logs, not her swearers, came closer to the truth.

6. The Court found the Argentina at fault for failure to make proper use of her radar equipment, immoderate speed under Article 16 of the Inland Rules, 33 U.S.C.A. § 192, failure to stop her engines on hearing forward of the beam the fog signals from the Antinous at C—4½, failure to sound fog signals and for proposing and persisting in a starboard to starboard passage in fog and without assent from the Antinous.

several charges of fault [7] still asserted by Cargo.

Oddly enough in making subsidiary fact findings and these fact-legal conclusions, the Court *added* to the Argentina's speed through the water the 4 knot current but *deducted* it from that of the Antinous. This made the Argentina's speed 17.5, 13.5, and 8.5 KTW at full, half and slow ahead in contrast to the Antinous' corrected speed of 10.2 at full ahead and 3.1 at half ahead. It was this latter speed of 3.1 KOG which the Court found moderate.

There are several things quite unique about this case and the successful development of it by the Antinous. This includes the rare fact that the Antinous, the prevailing party, succeeded in the face of solemn log entries which either condemn [8] her if accepted or cast considerable doubt on the integrity of her story if rejected on the basis of the explanation offered. Indeed, the *rejection* of the log entries has implications even more disturbing than acceptance of their truth, as damaging as that would be. For the story was that the Mate on watch, unable to record bridge bell orders because he dropped his flashlight, made up the bell book record [9] an hour later from his estimate [10] of the time of the orders and, based upon these inaccuracies made up, still another hour later, the deck log, note 8, supra. He swore that he knew the deck log entry, note 8, supra, was wrong, and the Pilot-Chief Officer and Master, each of whom had subscribed to the log some hours thereafter, likewise acknowledged that at the time the log was tendered to the United States Coast Guard Investigating Officers later that very day, it was known to be wrong. Accepting the Master's explanation as to the source of the errors (dropping the flashlight) such subsequent action hardly squares with our notions of the importance of the vessel's logs or the necessity that they speak, or at least are thought to speak, the truth as the lines are written and subscribed. The Georgian, 5 Cir., 76 F. 2d 550, 551, 1935 A.M.C. 556, 558.

Next on matters of extreme importance, there was a marked discrepancy, always in favor of the Antinous, between what was sworn to under oath in the extensive Coast Guard investigations held shortly after the occurrence, and that

7. The Court found the Antinous (A) was not at fault for failing to anchor either near the East bank or by crossing the river diagonally to the anchorage near the West bank; that she (B) was operated at a moderate speed under proper control; (C) had sounded proper fog signals; (D) had responded properly to the Argentina's signals; (E) maintained a proper lookout and had (F) acted prudently in rejecting the 2-blast passing proposal.

8. A *crucial question was the speed of the Antinous* and whether, on hearing the first 2-blast signal from the then unseen Argentina, she complied with the duty to stop and thereafter proceed with caution. The deck log plainly states that the engines were not stopped at C—2 and it was not until C (0200 hours) that the stop-full astern engine maneuvers were undertaken almost simultaneously. The deck log of the Antinous contains the following entries:

"0158 A vessel sounded passing signal 'two blasts' and was answered immediately with danger signal.

Approaching vessel answered danger signal and repeated 'two blasts'. This vessel sounded danger signal again.

"0200 Vessel stopped and rung full astern 'and given extra jingle' Vessel proceeded to come without altering course and fell against this vessel's bow. * * * "

9. The actual bridge bell book entries were:

0142 [C—18]   Slow Ahead * vis. becoming limited fog signals started

0200 [C]   Stop *—Full Astern *—hit tanker & Full Astern *

* Shown by usual symbols

10. This is perhaps the most remarkable thing about this whole phase. The Third Mate, at the bridge telegraph after the entry of 0142, note 9, supra, made no entries until an hour after collision. Except for the Collision Time (0200) which he fixed precisely as he had glanced at the clock at the moment of impact, all times were estimated and then writ-

sworn to three years later in Court. Lykes Bros. Steamship Company v. Union Carbide & Carbon Corporation (Velma Lykes—Tug Anita D), 5 Cir., 253 F. 2d 444, 1958 A.M.C. 722. The lookout testified [11] before the Coast Guard that in the moments before the 2-blast signal from the Argentina was heard, he heard short blasts one and one-half points on the port bow which he assumed were fog signals. Shortly the Argentina came into view bearing one and one-half points on the port bow. If that were so, it was a patent fault for Antinous not to have stopped her engines. On the trial his testimony was that in the Coast Guard hearing testimony, he was referring to a vessel which had passed them while abeam Scarsdale Light. Since that point was fixed on land and collision occurred at least a half mile above this Light, this meant that at the Antinous' speed of 3.1 KOG this passage occurred ten minutes before collision.

Of course, with the admitted speed of the Antinous, the exigencies of litigation required all the distance that could honestly be obtained on the issue of the range of visibility. The Pilot, on the trial, swore that this was two ship lengths or more, and the Court so found. At the Coast Guard hearing, he testified that he estimated the visibility to have been "500 feet, maybe." We need not determine whether on his acknowledgment that he had testified to whatever the Coast Guard record showed he had, this made this excerpt something more than prior inconsistent statements and admissible assertively, McCormick on Evidence, § 39, pp. 73–82; Wigmore on Evidence, 3rd ed., §§ 1017, 1018, see note 11, supra, for the Antinous subsequently offered in evidence other excerpts which became proof of the facts stated that visibility was at most a ship length.[12]

---

ten in the bell book without consulting anyone or first checking against the engine bell book. As recollected and estimated, they jibe almost to the second:

| Bridge Bell Book | | Engine Bell Book | |
|---|---|---|---|
| 0201 | Slow Ahead | 0201+ | Slow Ahead |
| 0201.5 | Stop | 0201+ | Stop |
| 0207 | Slow Ahead | 0207 | Slow Ahead |
| 0208 | Half Ahead | | |
| | | 0208—½ | Half Ahead |
| | | 0208—½ | Full Ahead |
| 0209.5 | Full Ahead | | |
| | | 0209—½ | Stop |
| | | | Full Ahead |
| | | 0209—½ | Full Ahead |
| 0210 | Stop | 0210 | Stop |
| | | 0210—½ | Full Astern |
| 0211.5 | Full Astern & Stop | 0211 | Stop |
| | | 0211 | Half Astern |
| | | 0211—½ | Full Astern |
| 0212 | Full Astern | | |
| 0213 | Stop & let go | 0213 | Stop |
| 0219 | Slow Ahead | 0219 | Slow Ahead |
| 0220 | Stop | 0220 | Stop |

---

11. It was stipulated that the Coast Guard record testimony of the lookout and four or five others could be introduced as original evidence. This was not then the case of mere proof of prior inconsistent statements admissible for impeachment but not in proof of the facts stated. Tropical Marine Products, Inc., v. Birmingham Fire Insurance Co., 5 Cir., 247 F.2d 116, 1957 A.M.C. 1946, certiorari denied, 355 U.S. 903, 78 S.Ct. 331, 2 L.Ed.2d 260.

12. "* * * When he [the Argentina] answered my danger signal the first time and gave me two blasts and I gave him the danger signal again, he came into

There were many other specific instances on such crucial items as the time [13] elapsing between the giving, receipt and execution of the stop order at C—2, the full astern at C—1, and between either or both and actual collision impact, the reason for not stopping the engines, distance and bearing of the Argentina as she came into view and the like.

Another thing is that in the Antinous' advocacy unavoidably carried forward in many of the findings prepared by her Proctors and adopted [14] by the Court, there is a remarkable rejection of unfavorable positions and testimony of witnesses otherwise championed and a tendency to switch positions [15] as exigencies seem to require.

And perhaps strangest of all was the judicial admission by the Argentina that she was solely at fault and the Antinous free from fault. For this admission was spurious, not in the moral sense, but in the legal sense. No disparagement of motive or conduct by parties or counsel is made or intended. On the contrary, settlements are to be encouraged and this one certainly reflects the consummate skill of the Argentina's proctors who, as articulate craftsmen, had much reason to be pessimistic about the case as a whole which included not only Cargo's substantial claim, but extensive claims

view, possibly—I would say *at the most a ship length away from us.*" (Emphasis supplied.)

13. Much of this was in the stipulated portions of the Coast Guard record, note 11, supra.

14. We do not discredit them or treat them as any less the Court's findings. Mississippi Valley Barge Line Co. v. Cooper Terminal Co., 7 Cir., 217 F.2d 321, 1955 A.M.C. 266; O'Leary v. Liggett Drug Co., 6 Cir., 150 F.2d 656; Simons v. Davidson Brick Co., 9 Cir., 106 F. 2d 518, 521; Schilling v. Schwitzer-Cummins Co., 79 U.S.App.D.C. 20, 142 F.2d 82; cf. The Severance, 4 Cir., 152 F.2d 916, 1946 A.M.C. 128, certiorari denied Stone v. Diamond S.S. Transp. Corp., 328 U.S. 853, 66 S.Ct. 1344, 90 L.Ed. 1626; Red Star Towing & Transportation Co. v. The Hudson, 2 Cir., 219 F.2d 307, 1955 A.M.C. 510. If they go too far, they are weakened intrinsically because they go too far, not because Proctors under local Admiralty Rule 12 have first drafted them.

15. For example, on the issue of the speed and movement of the Antinous as the Argentina came into view, Antinous vigorously asserts that Capt. Brummelen, Master of the S.S. Steel Chemist following downstream one-half mile or so astern of the Argentina and who had such a ringside seat by radar that he called to his pilot to come over and watch a collision take place, was not in a position to state, as he emphatically did, that the Antinous rather than having sternway was actually moving ahead through the water and had, during these two minutes (fixed by the two-blast signal and the alarms) moved a quarter of a mile from one position to another fixed with precision by him on two charts using simulated range rings. At the same time the Antinous, desirous of reducing as much as possible the distance made good over the ground from C—18 to C, asserts that Brummelen's fixing the point of collision at one-half mile rather than three-quarters of a mile above Scarsdale Light as fixed by her own pleaded sworn answer, and testimony of her watch officer, Pilot, the Pilot of the Steel Chemist and the Argentina, was the only reliable guide. Likewise, to Cargo's contention that the Antinous should have anchored near the East bank as fog closed in, the reply, was that there was too much downbound traffic in this area for this safely to be done. Later, in asserting that unique circumstances, cf. Polarus Steamship Co. v. The T/S Sandefjord, S.D.N.Y., 1956 A.M.C. 1000, affirmed 2 Cir., 236 F.2d 270, 1956 A.M.C. 1779, made the rule of sight for moderate speed inapplicable, the Antinous contended that she had no reason to anticipate down-bound vessels within 200 feet off the East bank. To the latter may be added the strange contradiction made in refutation to Cargo's experts who testified that descending vessels taking the bend usually followed the course of the Argentina with ascending vessels proceeding diagonally toward the West bank. Cross examination of these experts by the Antinous and her own controverting experts' testimony was that vessels did not follow any pattern—one could expect them to be in any portion of the River and especially so in fog.

by both vessels for collision damage. But in that setting, this was not a judicial admission freely made. It was a tails-you-lose-heads-I-win settlement [16] made prior to the filing of the Antinous 56th Rule petition for Impleader and Argentina's sworn answer to that petition and to the original Cargo libel. [17] By making the settlement, the Argentina gave up nothing. She knew she could never escape a finding of partial fault. She knew she could never fasten sole fault on the Antinous. The most she could hope for was a mutual fault decree. She knew that if she did so, she would find herself paying one-half of her own cargo's losses under the now familiar principles [18] even though she had no direct liability to Cargo under the Carriage of Goods by Sea Act, 46 U.S.C.A. §§ 1300–1315. To admit sole fault and withdraw her strength from the side of her Cargo with whom, as an ally, she had been making common and vigorous cause up to date, might eliminate that risk altogether, especially so since, as the agreement permits, if this tactical maneuver were to fail in its objective, the Argentina could still have all she would have ever gotten.[19] It was an admission of fault only so long as it worked.

16. The written settlement agreement executed by Antinous and Argentina stated that " * * * in consideration of the Argentina not now filing a libel * * * for the Argentina's damages * * * and of the Argentina admitting that its navigational fault * * * was the sole cause of this collision * * * " the two vessels agreed that " (2) If the final outcome * * * " on trial or appeal is that both vessels were at fault "the Antinous agrees (nowithstanding the Argentina's judicial admission of sole navigational fault) that * * * " the Argentina, by libel or arbitration shall recover her legally provable damages on the basis of mutual fault; and that "(3) * * * If the final outcome" by trial or appeal finds the Argentina to be partially or wholly at fault, then the Antinous shall recover accordingly all or part of her provable damages by libel or arbitration. It bound both not to make a separate settlement with Cargo, but permitted either to inform Court and counsel of the agreement. The latter was done and the settlement agreement was received as an exhibit.

17. Cargo's libel was filed April 9, 1953. On August 31, 1953, the Antinous. before filing answer to the Cargo libel, filed a 56th Rule [28 U.S.C.A.] Impleader against the Argentina and subsequently an answer to the original Cargo libel was filed. The Argentina on September 21, 1953, filed separate answers to the Antinous' Petition of Impleader and Cargo's original libel admitting its sole fault. The settlement agreement binding it to do so was consummated ten days earlier on August 20, 1953.

18. The Irrawaddy, 171 U.S. 187, 18 S.Ct. 831, 43 L.Ed. 130; The Chattahoochee, 173 U.S. 540, 19 S.Ct. 491, 43 L.Ed. 801; Aktieselskabet cuzco v. The Sucarseco (Toluma-Sucarseco), 294 U.S. 394, 55 S.Ct. 467, 79 L.Ed. 942, 1935 A.M.C. 412; United States v. Atlantic Mutual Insurance Co. (Esso Belgium-Nathaniel Bacon), 343 U.S. 236, 72 S.Ct. 666, 96 L.Ed. 907, 1952 A.M.C. 659; The Grecian (Grecian-City of Chattanooga), 2 Cir., 78 F.2d 657, 1935 A.M.C. 1039.

19. The settlement also eliminated the unpredictable likelihood of the Court holding the Antinous liable to Cargo though as between herself and Argentina the major-minor fault rule would exonerate the Antinous, The Modemi, 5 Cir., 58 F.2d 916, 1932 A.M.C. 1600; The Michael Tracy (Cape Cod-Michael Tracy), 2 Cir., 43 F.2d 965, 1930 A.M.C. 1855; Stadacona, 6 Cir., 242 F. 624, Griffin on Collision, 509–511, and on that basis grant indemnity or contribution to the Antinous, Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318, 1952 A.M.C. 1. This possibility was posed by Griffin, id. at 510:

"If a case arises in which B, [Antinous] the minor fault vessel, is held liable to A's [Argentina's] cargo, but where, as between the vessels, A [Argentina] is held solely liable, one may wonder whether, in the resulting offsets between A and B, the rule of the Chattahoochee, 173 U.S. 540, [19 S.Ct. 491, 43 L.Ed. 801] will permit B [Antinous] to throw the entire cargo damage on A [Argentina], in spite of the latter's immunity from direct suit under the Harter Act, [46 U.S.C.A. § 190 et seq.] and the Carriage of Goods by Sea Act."

We have seen substantially such results occur in the now prevalent third party longshoreman death and injury cases: Ryan Stevedoring Co. v. Pan-Atlantic

**20**

As disturbing as some of these implications may be, we find it unnecessary to determine whether they would make related findings clearly erroneous. This is so because in the setting of which these and other circumstances were a part, the speed of the Antinous was plainly immoderate.

■ Without a doubt the circumstances called for the application of the traditional rule of sight by which the vessel must proceed at a rate of speed which will allow her to come to a stop within one-half limit of visibility. The Tug Percheron, 5 Cir., 246 F.2d 135, 1957 A.M.C. 1941; The Nacoochee, 137 U.S. 330, 339, 11 S.Ct. 122, 34 L.Ed. 687, 690; The Umbria, 166 U.S. 404, 417, 17 S.Ct. 610, 41 L.Ed. 1053, 1060; Griffin on Collision, pp. 288–296. In this area the Mississippi River was a busy artery in which many vessels upbound, downbound and at anchor might be expected. The hazard of proceeding on was demonstrated by the contemporaneous decision of two other ascending vessels to come to anchor near the West bank and the determination by the Antinous Pilot and Master to do the same.[20] That traffic made it unwise either to anchor immediately near the East bank or cut across to the West only served to increase, not decrease, the demand for vigilant caution.

As she continued on, conditions got worse, not better. Notwithstanding this,

S.S. Corp., 349 U.S. 901, 75 S.Ct. 575, 99 L.Ed. 1239, 1955 A.M.C. 1422; Weyerhauser S.S. Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491; cf. American Stevedores, Inc., v. Porello, 330 U.S. 446, 67 S.Ct. 847, 91 L.Ed. 1011, 1947 A.M.C. 349; Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., supra; Czaplicki v. S.S. Hoegh Silvercloud, 351 U.S. 525, 76 S.Ct. 946, 100 L.Ed. 1387, 1956 A.M.C. 1465.

20. The Pilot testified:
"Q. Captain, you evidently considered that it was not safe to proceed under the conditions you encountered or you would not have considered anchoring. Isn't that correct? A. That's correct. Yes, sir."

she persisted in holding her speed at half ahead until within two minutes of the fateful impact. We need not minutely examine the evidence on speed. The Court fixed this at 7.1 KTW.[21] As thus fixed it was, in our view, an immoderate speed. We agree, however, generally with Cargo that this was the irreducible minimum and there is much to indicate that speed was actually greater. This is demonstrated by the distance made good over the ground between the two known times of C—18 and C. Of course the shorter the distance, the lower the speed. By liberal adjustments in favor of the Antinous fixing the starting point one thousand feet below the Seatrain Loader and the point of collision one-half mile above Scarsdale Light as fixed by Capt. Brummelen, the distance made good was 1¼ miles or a minimum speed over the ground of not less than 4.1 knots. Using estimates of a beginning point farther below and extending the point of collision to ¾ of a mile above Scarsdale Light as the Antinous' witnesses almost universally swore, the speed made good over the ground ranged from 4.8 to 5.8 KOG with the speed through the water ranging from 8.8 to 9.8 KTW. It bears repeating here, see note 15, supra, that Capt. Brummelen on the S.S. Steel Chemist, from his vantage point watching a collision develop and occur, fixed the movement of the Antinous with some precision at close to a quarter of a mile, a speed much in excess of 3.1 KTW.

The Court found that the Master and Pilot correctly "reasoned that it would be unsafe to anchor there in fog where other vessels might be encountered * * *", and in the Conclusions of Law held that the Antinous was not obligated to then anchor since " * * * In that area of the River she was * * * navigating after entering fog, river and traffic conditions rendered anchorage unsafe."

21. The 7.1 KTW figure was based entirely on the pitch-slip-revolution formula. To find the speed of 3.1 KOG the Court simply deducted the 4 knot current.

Whether the speed was **7.1** KTW or greater does not really matter. At the lesser figure there was no showing that this would permit the Antinous to stop within half the distance of visibility and the evidence on what she could do at an even lower speed (3.1 KTW) carried as its own reflex proof positive that it could not be done at 7.1 KTW. The evidence most favorable to the Antinous on her reversing capabilities came from a Company Pilot who had conned her many times. Under questioning which carefully prescribed a simulated speed through calm water of 3.1 KTW, he stated that from the moment the full astern order was given until the vessel was stopped, it would take in point of time 45 seconds to a minute and in distance approximately one ship's length.

But she was not proceeding at 3.1 KTW at the time either the stop order was given at C—2 or full astern at C—1. She was proceeding through the water at a speed over twice that great when the stop order was executed [22] and there is no showing at all that within the seconds remaining in the minute of C—2 her momentum fell off anywhere near to a speed of 3.1 KTW. And the most favorable evidence from her Engineer Watch Officer was that with the engines stopped, it would take 30 seconds before the *engines* would be turning full astern.

The speed through the water as C—1 commenced was greater than 3 KTW and the minute was half over before the full astern order was effective. The bridge Watch Officer fixed impact time at precisely 0200 and so did the Chief Engineer in the engine room. The Engineer Watch Officer fixed the time between the receipt of the full astern order and the impact at 50 seconds. This means that on her own story put forward most favorably to her, the Antinous had effective emergency full astern on her propeller for 20 seconds.

■ Of course the major error in the argument advanced by the Antinous and

adopted by the Court was that the relevant speed was *over the ground* so that the assumed current of 4 knots should be deducted. We think it would be unwise here precisely to chart the circumstances and the extent to which tide or current is or is not to be taken into account in computing moderate speed in fog situations. We have no difficulty though in saying that for these circumstances it was not to be deducted. The Antinous was not then navigating relative to an anchored vessel or a fixed object. She was, or ought to have been, maneuvering with respect to another vessel not only moving, but moving at a speed she and the Court characterized as grossly excessive. That being so, to satisfy the test in terms of ability to stop, the Antinous had to demonstrate that in the common body of water affecting both vessels substantially alike, she could stop before she traversed one-half the distance she could see. A. H. Bull S.S. Co. v. United States, 2 Cir., 34 F.2d 614, 1929 A.M.C. 1175; The Lillian Anne-Pennsylvania, 2 Cir., 1934 A. M.C. 569, certiorari denied Chesapeake & Delaware Steamboat Company v. The Tug Pennsylvania, 293 U.S. 575, 55 S.Ct. 86, 79 L.Ed. 673, 1934 A.M.C. 1410; The Goldshell-White Plains, 2 Cir., 224 F.2d 86, 1955 A.M.C. 1438; Marsden's Collisions at Sea, 10th Ed. 1953, p. 479–480. It has been well put: "That is to say, it is the duty of a vessel to proceed in a fog at a moderate speed, both with respect to moving and to anchored vessels. That she is proceeding at a moderate rate of speed over the ground will not free her from blame, if, proceeding immoderately through the water, she strikes a vessel under way. That she is proceeding moderately through the water will not excuse her, if, proceeding immoderately over the ground, she strikes a vessel properly anchored. * * * " The Yarmouth, D.C. Mass., 100 F. 667, 671. We do not regard The Silvanus, D.C.La., 56 F.2d 257, 1932 A.M.C. 154, affirmed Nederlandsche In-

---

**22.** See note 3, supra. The stop at C— 2 was executed at 0158 *plus* and the full astern (C—1) at 0159 *plus*, engine room time. The recorder testified that a plus

meant any time after the sweep second hand had passed the preceding minute until it passed the next minute.

**22**

dische Tankstoomboot Maats v. Standard Oil Co., 5 Cir., 66 F.2d 113, 1933 A.M.C. 1211, to the contrary.

■ On her own most favorable testimony, we do not quite see how the Court could find that the Antinous was stopped and making sternway. But accepting this, there was still no proof that this remarkable feat, achieved in a minute's time and in a way which exceeded her capabilities at a speed half as fast, was accomplished within one-half of the distance between them. To stop or to be able to stop before collision is not enough. That must be done within the vessel's share [23] of visibility.

■ Once we reach this conclusion that the District Court on the basis of its own fact findings was wrong in its legal conclusion that the speed of the Antinous was moderate, there is no room for application of the rule of the Alexandre v. Machan (City of New York), 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84. The evidence of the Antinous' fault on this score is clear, indeed, uncontradicted. We may, as did the District Court, call the Argentina's faults glaring. But the statute imposed a positive duty on the Antinous to proceed at a moderate speed. The test of moderate speed is stated in terms of being able to stop within one-half of the distance separating the two vessels assuming the other is likewise proceeding at moderate speed. But this does not mean that the duty is not owed if, as might well be the case here, the approaching Argentina's speed was likewise excessive. Fog rules take into account the uncertainties as this enigma of nature shuts out sound and sight and frequently understanding. The risk of collision in fog is best avoided by complying with all three requirements, blowing and listening for fog signals, proceeding at a moderate speed, and stopping after whistles from unseen vessels are heard forward of the beam. While the law normally concedes that one may act upon the assumption that others are obeying, not violating, the law, the operation of statutory navigational requirements and the heavy sanction which Courts place on violations of them, The Pennsylvania, 86 U.S. 125, 19 Wall. 125, 22 L.Ed. 148, reflect a purpose neither to make an outlaw of one violating the rules, nor excuse the other from the performance of correlative duties. That this is a wise rule is shown here by the slight additional margin which would have prevented this collision.

For 18 minutes the Antinous was proceeding in fog at 7.1 KTW. She was entitled to do that only if she could see twice the distance which that speed required for her to stop in the water. But she could see only that distance which required that her speed be 3.1 KTW if she were to stop within her half. Consequently, she had failed in her duty for nearly 18 minutes. Her speed was not moderate when she first heard the Argentina's two-blast signals. It was not moderate as she speculated for a minute's time and stopped her engines. It was not moderate as the Argentina hove into view.

■ When a plain statutory command is violated on the uncontradicted story of the vessel's own witnesses stated most favorably to her cause, she cannot escape the consequences because fault of the other may be more glaring, more flagrant, or more shocking. Her last clear chance to extricate herself is to show that the statutory fault not only did not, but could not possibly have, caused collision. The Pennsylvania, supra. That heavy burden cannot be met here.

The Cargo was entitled to a decree, and the cause is accordingly reversed and remanded for other and not inconsistent proceedings.

Reversed and remanded.

23.  The Court found that at the moment of impact the Argentina's speed was 3 to 4 KTW.