**HIGGINS, Incorporated, Appellant,**

v.

Johnson L. **HALE** et al., Appellees.

No. 16829.

United States Court of Appeals
Fifth Circuit.

Jan. 9, 1958.

John P. Hammond and Montgomery, Barnett, Brown & Read, New Orleans, La., for appellant, C. Randall Jones, Jr., Pass Christian, Miss., of counsel.

No appearance entered for appellees.

Before RIVES, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

A proceeding which, with its 415 pages of printed record after nearly a week of trial below, has long since exceeded in costs and judicial energy expended the $700 difference between what was sought and obtained, comes to us with the irrepressible nostalgic hope of all proctors that we revive, today at least, the ancient pre-McAllister function of a trial de novo. It really comes to this for the burden of meeting the clearly erroneous test, McAllister v. United States, 348 U. S. 19, 75 S.Ct. 6, 99 L.Ed. 20, 1954 A.M. C. 1999, in a fact controversy of this kind, is difficult, indeed. And this is rightly so for a case of this type in which the act of adjudication is the result of the impact of the continuous barrage of conflicting facts and running advocacy on the mind of the trier. Bisso v. Waterways Transportation Co., 5 Cir., 235 F.2d 741, 743, 1956 A.M.C. 1760, 1761.

This was a libel *in rem* against the geophysical vessel Phyllis Bamsu and against her owner *in personam* to recover the unpaid balance of $1,545 on a repair bill of $5,675.23. After a trial in which an experienced judge patiently acquiesced in extended argumentative jousting between the libelant's proctor and the Shipowner's principal expert who tenaciously adhered to his oft-expressed opinions of unreasonableness of worktime, the Court found the Shipyard's time excessive as to four items. The decree awarded $805.72 and by this appeal, libelant seeks to restore the amount of the reduction of $717.75.

The libelant did prove an impressive case and one which, had it been fully credited, would have resisted the perils, not alone of the seas, but of a capsizing by us of the findings from any inherent unseaworthiness as clearly erroneous. But the fact that the Shipyard's evidence showed in great detail with hundreds of time cards, payrolls, job sheets, and the like, the exact number of men by badge number, classification, time and place of performance of specific jobs, the work done and the time actually spent in it, did not necessarily prove up the whole case.

Indeed, the Shipyard, apparently preoccupied with this dovetailing of time-job-accounting records, became transfixed by the selfmesmerism of its own infallibility into thinking that if the time was actually used, it must, perforce, be paid for.

This was to ignore the whole purpose, so plainly evident from the time the opening volley was fired, of the defense whose answer simply was: assuming accuracy of time, that time was excessive, and hence the account is not reasonable.

The result was that after introduction of the Shipyard's chain of records and corroborative oral testimony now comprising 117 pages of the printed record, the rest of this long trial was concerned with evidence, now covering the remaining 248 pages of the record, *pro* and *con,* on the reasonableness of time actually taken as opposed to that which, in prudence, ought to have been required. In this process the Court patiently heard and reheard the testimony of the Shipowner's chief expert, long an employee of the American Bureau of Shipping, 46 U.S.C.A. §§ 369(b), 881, who had just begun his career as an independent consulting marine surveyor, and whose competence cannot be seriously open to question. The fact that he had not personally seen the vessel while under repair, knew nothing personally about the precise making of the actual repairs, and had just shortly been retained as a prospective expert witness on a professional fee basis did not make his testimony inadmissible. Nor does it so destroy his credibility that we are compelled to reject it or findings based on it as clearly erroneous.

It is the professional, skilled judgment of an expert which makes his opinion receivable. If the record fairly reflects that his training, experience and activities comprehend those factors which would lead to an informed judgment, the opinion does not become inadmissible merely because the *precise* situation has not been previously encountered. Roth v. Bird (The Wingate), 5 Cir., 239 F.2d 257, 1957 A.M.C. 112. It is the very essence of the skilled expert that the accumulative effect of prior training and experience fits him, where his function is operational, to take action never before required. And so it is where his function is that of a testimonial expert, to describe, analyze, and appraise action which ought, or ought not, to have been taken.

It may be that in the opening phases of this running controversy the expert's opinions were seemingly based largely on the undisclosed information he had received from the Shipowner in pretrial preparation for his appearance. But after reading the whole of this testimony and all of that in the 248 pages on this related defense, it would be an affectation either to require a reversal and remand to correct the form of the interrogation, or to hold that this careful trial judge, sitting in the salt water atmosphere of admiralty's traditional informality, was led to decide a case on undisclosed hearsay.

This chief expert was thoroughly swabbed by prolix cross examination which only served to reinforce the basis for the surveyor's opinions. It showed that on the principal items in dispute, he had carefully computed, with indicated liberal additions for adverse contingencies, what, from his experience, each job ought to take when done by a competent shipyard. In the course of endless examination, the Court was able to see how and to what extent the variables presented by the Shipyard's interrogation differed from the suppositions on which the expert's opinion was based, on their significance, here and there, in point of time required. That the Judge did not blindly accept these opinions, but made adjustments within the range of the whole testimony, reflects that this was received, not as a tailor-made decision by a paid and partisan outsider appearing in the guise of a witness, but as evidence from which a conscientious trier could draw the critical inference.

On the merits, therefore, the case calls for an obvious affirmance. And so it does also to the Shipyard's hope that if not successful as it set forth on this voyage of little prospect, it might get all or a considerable part of the freight paid by assessing all of the costs against the vessel and owner. To do this, it (1) complains that, recovering, as it did, *something*, the trial court erred in decreeing that each party should bear its own costs; and then (2) argues that since this was wrong, we should right it and assess all of the cost, here and below, against them.

This would indeed be an inconsiderable tail wagging a prodigious dog. Moreover, it is beseeching us as an admiralty court to ignore what is so well established, that in the matter of costs, the Court has the widest latitude to insure that an injustice is not done by an inexorable rule that costs follow the decree. Many of these circumstances, present here in abundance, are discussed in Benedict on Admiralty (6th Ed.), Vol. 3, §§ 435, 439, 440.

The appeal fails here on the merits and on costs which, for the appeal, now go against appellant.

Affirmed.