**Frank W. CATES, Plaintiff,**

v.

**UNITED STATES of America and Reynolds Submarine Services Corporation, a Florida corp., Defendants.**

**No. 68–172–Civ–CA.**

United States District Court
S. D. Florida,
Miami Division.

Dec. 24, 1969.

John H. Lewis, of Meyer, Leben, Fixel & Gaines, P. A., Hollywood, Fla., for plaintiff.

Thomas L. Jones, Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., William A. Meadows, Jr., U. S. Atty., and Robert L. Steuer, Asst. U. S. Atty., Miami, Fla., for United States.

MEMORANDUM OPINION

ATKINS, District Judge.

A distinguished feature of anglo saxon jurisprudence is its ability to change when confronted with an unjust result dictated by existing law. In this case there was an occurrence which I find would work such an injustice and I accordingly hold contrary to the existing weight of authority. The Plaintiff here, Frank W. Cates, sued Reynolds Submarine Services and the United States of America for injuries he received aboard the U.S.S. Nimble while in Reynolds' employ. At the time of the incident Reynolds was operating as a contractor

for the U. S. Navy. Shortly prior to the trial date Cates settled his claim with Reynolds. On the day the trial was to begin the Government requested a continuance on the ground that it was unaware of the settlement and had intended to rely on those witnesses which Reynolds had indicated it would call. I reluctantly granted a continuance. Several weeks later when the trial did begin the Government moved for dismissal on the ground that Cates' settlement with Reynolds had failed to expressly reserve his rights against the United States. See Billiot v. Sewart Seacraft, Inc., 382 F.2d 662, 663 (5th Cir.1967). I reserved ruling on this motion in order that the trial proceed. At this time, after careful consideration I have determined that the Government's motion should be denied.

In exchange for the sum paid him by Reynolds, Cates executed a "release of all rights" to Reynolds, an alleged joint tort feasor with the Government. This instrument waived Cates' rights against Reynolds and did not expressly reserve his rights against the U.S. According to the Restatement of Torts § 885 (1939) and existing case law Billiot, supra, this failure to reserve should extinguish Cates' rights against the U.S. I feel that the growth of the law should countenance a change in this rule. Cates clearly intended to reserve his rights against the United States. The failure to do so expressly was primarily an oversight on the part of Cates' attorney. We have come half way from the old common law rule that release of one joint tort feasor released all others regardless of the intent of the parties. I feel logic compels me to take the other one half step and reject the necessity of express reservation of rights. Accordingly, I proceed now to treat the merits of this cause in which I find for the plaintiff.

Cates sought damages for injuries received while debarking from the U.S.S. Nimble into its motor whaleboat off the coast of Spain on the night of February 21, 1966. The Government denies unseaworthiness of the Nimble and negligence of its crew.

As a result of the mid-air collision between a U.S. Air Force bomber and another plane, a hydrogen bomb was lost off the coast of Palamores, Spain, in January, 1966 and Task Force 65 was formed by the U. S. Navy to locate and retrieve the bomb.

Accordingly, the U. S. Navy entered into a contract with Reynolds Submarine Services Corporation of Miami, Florida. Reynolds was to provide its deep submergence vessel, the ALUMINAUT, along with its crew, to search for the bomb. The contract also provided for services of the mother ship to the Aluminaut, Privateer. The Privateer, however, was unable to proceed with the Aluminaut to the site of the recovery area consistent with the time requirements of the operation. The Aluminaut was loaded aboard the USS Fort Snelling, a Navy LSD, and transported to the site. The Privateer was to follow. Members of the Aluminaut crew, employees of Reynolds, including the plaintiff Cates, were flown to Spain. According to Cates, he was hired by Reynolds as a "seaman" or "diver" on February 15 or 17, 1966 in Miami, Florida. He did not, however, sign any shipping articles or employment agreement. Prior to his employment by Reynolds, Cates had served in the U. S. Navy as a seaman (E-3) from 1957–1961 with duties as a coxswain of a small boat. He had also done some scuba diving off a shrimp boat in Miami.

After arrival of the Aluminaut aboard Fort Snelling at the recovery site, the USS Nimble, an ocean-going minesweeper, was assigned to tow the Aluminaut during search operations until Privateer arrived on the scene. The Aluminaut's crew, including Cates, was berthed on the USS Fort Snelling until the arrival of Privateer. Transportation for Aluminaut's crew between the two vessels was by boat.

During a day's normal operations, the Nimble, after arrival of the Aluminaut's

crew on board in the morning, would tow Aluminaut to the area to be searched for the day. Upon completion of the search, she would then tow Aluminaut back to the anchorage area and the Aluminaut crew would be taken by boat to the USS Fort Snelling for the night.

The crew of the Aluminaut had no duties in connection with operating the Nimble. Cates' job consisted primarily of getting into the water and loading "shot" aboard the Aluminaut which caused or helped it to submerge to great depth.

At approximately 8:00 p. m. on February 21[1], 1966, search operations by Aluminaut had been completed for the day and it had been towed back to the anchorage area in the vicinity of Fort Snelling. Cates, along with other Aluminaut crew members, was about to debark from the Nimble into its motor whaleboat, a 26 foot craft, to be taken back to Fort Snelling for the night. He does not recall whether he was the first Reynolds employee to debark into the whaleboat or not, but three sailors, the normal boat crew consisting of the coxswain, engineman and bow hook, were in the boat. According to Cates, the sea was rough as he began to descend the jacob's ladder[2] into the unanchored whaleboat. The whaleboat was rising and falling 6 to 8 feet with the motion of the rough sea and would hit the side of the Nimble and then bounce off.

As he continued his descent down the ladder, the whaleboat was in the process of rising with the sea and hit his feet or legs, causing the ladder to swing away from him. Cates' feet came off the ladder. He put one foot on the edge of the whaleboat as it rose and tried to grasp the handrail along its side. The whaleboat began its downward motion and it was at this point he fell into the whaleboat.

This was the first time a transfer to a whaleboat had been attempted. Because of the rough seas and the tendency of this type of boat to be unsteady in rough seas, it was clearly not a proper vessel for use of those circumstances. An LSM, a vessel of some fifty feet in length and known for its stability, was available for this purpose and generally used in making this transfer. Earlier in the day the captain of the Nimble had been instructed to use no vessels smaller than an LSM-6 for transfer because of the weather conditions.

■ I find the use of the jacob's ladder and the whaleboat under these conditions to have created an unseaworthy condition for which the Government is solely responsible. Cates himself was not negligent in any material way.

■ Plaintiff's claimed loss of income, based on his diminished earnings, aggregate $6100. There was evidence that he was suffering from a post traumatic neuroses. He continues to have headaches and backaches on occasion. I find that Cates sustained a 5% permanent partial disability of the body as a proximate result of the accident. Plaintiff's total medical expenses aggregated $196.50. He is entitled to an award of $8,000 less the sum of $2900 paid him by Reynolds, his employer, in settlement.

Judgment will be entered forthwith by the Clerk under Rule 58 in accordance with the above.

This memorandum opinion is filed in compliance with Rule 52 of the Federal Rules of Civil Procedure.

---

1. While his complaint alleges the injury occurred on February 22, 1966, it is clear from the testimony that it happened on February 21.

2. DeKerchove's International Maritime Dictionary, 5 Ed., p. 369 1956 defines a jacob's ladder as:

"A ship's ladder consisting of rope or chain sides with wood or metal rungs regularly spaced. One end is usually fitted with sister hooks or a shackle for hooking on."