Frank W. CATES, Plaintiff-Appellee Cross-Appellant,

v.

UNITED STATES of America et al., Defendants-Appellants Cross-Appellees.

No. 29874.

United States Court of Appeals, Fifth Circuit.

Sept. 20, 1971.

---

Robert W. Rust, U. S. Atty., Miami, Fla., Morton Hollander, Patricia S. Baptiste, Attys., Dept. of Justice, Washington, D. C., William D. Ruckelshaus, Asst. Atty. Gen., for defendants-appellants.

John H. Lewis, Miami, Fla., for plaintiff-appellee.

Fowler, White, Collins, Gillen, Humkey & Trenam, Miami, Fla., for other interested parties.

Before JOHN R. BROWN, Chief Judge, and PHILLIPS * and INGRAHAM, Circuit Judges.

## JOHN R. BROWN, Chief Judge:

In an appeal which for the most part ignores the distinctive role of this Court as though the balmy pre-McAllister [1] days of reconsideration of admiralty cases de novo were still the birthright of proctors who have also lost their title (see O/Y Finlayson-Forssa A/B v. Pan Atlantic S.S. Corp., 5 Cir., 1958, 259 F. 2d 11, 13, 1958 A.M.C. 2070, 2071; Higgins, Inc. v. Hale, 5 Cir., 1958, 251 F.2d 91, 92, 1958 A.M.C. 646, 647), this case does have two things of special interest.

The first is that what is admittedly a little case arose from a big crisis. Although then unknown to countless embassies, foreign ministers and highly placed world leaders, Frank Cates' fall into a misused Navy whaleboat grew out of the world's tensions when a mid-air collision involving an American Air Force bomber dropped an awesome H-bomb into the waters off the coast of Palamores, Spain, in January 1966. Task Force 65 was formed by the United States Navy to retrieve the bomb and relieve the world. Cates' role was that of a member of the deep-diving submarine, ALUMINAUT, owned and operated by his employer Reynolds.[2] For towage of ALUMINAUT and transfer of her crew to another government vessel used to quarter and victual them, the USS NIMBLE was assigned. Though no one suggests it by way of attack or defense, one could suppose that the critical nature of this international mission electrified the air.

Second, and more juridically important, the Trial Judge, who can truly be called learned for his prescience, sounded this high note: "A distinguished feature of Anglo-Saxon jurisprudence is its ability to change when confronted with an unjust result dictated by existing law. In this case there was an occurrence which I find would work such an injustice and I accordingly hold contrary to the existing weight of authority." Whether the course was as bold and precarious as thought, or whether existing principles surrounding those who go down to sea in ships—way down—would have just as readily rejected the Government's harsh plea is not now important. What is important is that the Judge proved his *see*worthiness [3] by anticipating the "release from the release" at the hands of the Supreme Court in Zenith Radio Corp. v. Hazeltine Research, Inc.[4]

In more austere language, this was the case. Frank W. Cates brought suit against the United States and Reynolds claiming damages for injuries suffered while debarking from the USS NIMBLE into a whaleboat alongside for transportation back to the quartering vessel. On the eve of trial, Cates settled his claim with Reynolds and executed a release in their behalf and their vessels'. Upon hearing the case, the District Court entered judgment against the United States in the amount of $8,000 less amounts paid to Cates by Reynolds in consideration of the release, 308 F.Supp. 199. We affirm.

Only two questions are really presented by this appeal: (i) Does a seaman's release which does not specifically reserve rights against another joint tortfeasor operate to release the unmentioned joint tortfeasor as a matter of law? (ii) Was Cates entitled to a warranty of seaworthiness?

---

* Of the Tenth Circuit, sitting by designation.

1. McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20, 1954 A.M.C. 1999.

2. Reynolds Submarine Services Corporation.

3. Cf. United States Lines Co. v. Williams, 5 Cir., 1966, 365 F.2d 332; Tropical Marine Products, Inc. v. Birmingham Fire Ins. Co. of Pa., 5 Cir., 1957, 247 F.2d 116, 1957 A.M.C. 1946.

4. Zenith Radio Corp. v. Hazeltine Research, Inc., 1971, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77.

## I. The Red Letter Release

On the date originally set for trial, all parties appeared and it was announced that Plaintiff had reached a settlement agreement with Reynolds. Plaintiff announced ready to proceed against the Government, but the Government sought and obtained a continuance.[5] Shortly thereafter, Plaintiff executed a formal written release of Reynolds, which was in everything but color a red letter release which virtually indentured Cates' future to the parties named.[6] When the case came up for trial a month later, the Government argued for the first time that failure to reserve rights against it expressly in the release operated to absolve the United States from liability.

The Government relies on the general common law rule that the release of one joint tortfeasor operates to release all tortfeasors unless the written instrument contains an express reservation of rights against others. See, e. g., Canillas v. Joseph H. Carter, Inc., 280 F. Supp. 48 (S.D.N.Y.1968); Restatement of Torts § 885(1); Prosser, Torts, (3d Ed), pages 268–272.

■ This argument, even if it validly states the general common law rule—and that if is a very big one [7]—overlooks two

---

5. The grounds for continuance were that the Government had expected to use Reynolds' witnesses to develop its case. These witnesses were not present in court on the date originally set for trial because of Reynolds' dismissal from the suit.

6. It was in sweeping terms as to those protected. But these were limited to "Reynolds * * * and/or its underwriters and their heirs, executors, administrators, successors and assigns, and their several vessels and * * * the vessel submarine Aluminaut and/or the M/V Privateer and the owners, agents, operators, charterers, masters, officers, and crews, of said vessels * * *."

It was construed in a sort of Miranda warning type of questions to which Cates replied in his handwriting. The Government stresses part E:

"Do you know that your rights include not only a right to sue for and recover maintenance, cure, and wages, but, also, a right to sue for and recover damages if you can prove that your illness and/or injuries were caused by negligence or by something wrong (unseaworthiness) with the vessel or vessels to which your rights relate; and that you can have your own lawyer advise you further on your rights should you wish to engage on before you sign this if you have not already done so."

The Government likewise emphasizes that in "at least two places on the release it is stated in large, bold face type that Cates was giving up every right he had. The third line on page one states 'BY SIGNING THIS YOU GIVE UP EVERY RIGHT YOU HAVE'. The second paragraph from the bottom of page one states 'I know this paper is much more than a receipt. IT IS A RE-

LEASE. I AM GIVING UP EVERY RIGHT I HAVE.'"

But completely overlooked is that in the following paragraph (2) it states that "in signing this release I am * * * settling in full with *the parties released*" (emphasis added) and by the question-answer method intent was made clear.

"D. Do you make the six numbered statements which are printed at the bottom of page 1 and at the top of page 2 and do you *intend* that the *parties* whom you *are releasing* shall rely on the statements as the truth? (Emphasis added.)
A. Yes."

7. The Government's brief does not even establish that this principle is a valid statement of the present common law rule. Four of the five cases cited by the Government do not give authority to their argument.

In Aro Mfg. Co. v. Convertible Top Replacement Co., 1964, 377 U.S. 476, 84 S.Ct. 1526, 12 L.Ed.2d 457 (a patent case), the Supreme Court specifically repudiated and rejected the old common law rule and refused to find that the joint tortfeasor was released. Rather, the Court announced, the test of the effect of a release turns on the intentions of the parties. Id. at 501, 84 S.Ct. at 1540, 12 L.Ed.2d at 477.

Likewise, Billiot v. Stewart Seacraft, Inc., 5 Cir., 1967, 382 F.2d 662 fails to support the Government's position, for in that case the release had specifically reserved rights against the joint tortfeasor, We gave effect to the reservation in the release and stated:

"Contrary to the old common-law rule, today a release *intending* to save the releasor's rights does not automatically

things. The first is the role of the Court in admiralty. Over a century ago this high calling was vividly described by Justice Story. "A court of admiralty is, as to all matters falling within its jurisdiction, a court of equity. Its hands are not tied up by the rigid and technical rules of the common law, but it administers justice upon the large and liberal principles of courts which exercise a general equity jurisdiction." The David Pratt F.Case No. 3597 (D.C. Maine 1839). And as we have more recently expressed it, "The Chancellor is no longer fixed to the woolsack. He may stride the quarter-deck of maritime jurisprudence and, in the role of admiralty judge, dispense, as would his land-locked brother, that which equity and good conscience impels." [8]

■ Second, a release of a seaman—long called the "ward of the Admiralty" [9]—is precarious, at best, and the burden is on the party setting up the seaman's release to show that it was given by the seaman with an informed understanding of his rights and a full appreciation of the consequences of his release.[10]

surrender those rights." Id. at 664 n. 1 (emphasis added). Importantly, we did not hold that a failure to reserve rights expressly surrendered those rights, but rather we followed the intent of the parties. In Smith v. Noble Drilling Corp., 1968, 390 U.S. 143, 88 S.Ct. 841, 19 L.Ed.2d 970 the Supreme Court remanded for further consideration in light of *Billiot.*

In Petroleum Carrier Corp. v. Carter, 5 Cir., 1956, 233 F.2d 402, this Court held that the instrument in question had *not* released the joint tortfeasor. Moreover, that case concerned a claim arising out of an automobile accident and did not involve admiralty considerations.

The only case cited by the Government which does support its contention is Canillas v. Joseph H. Carter, Inc., 280 F.Supp. 48 (S.D.N.Y.1968), apparently never appealed.

Not even the Restatement of Torts provision cited by the government offers much support for their argument, for the Comments to that section state:

"Furthermore, the tendency, is to give effect to the intent of the parties to a transaction rather than to regard as controlling the formalities with which the transaction is executed. The law has now developed so that it is possible to carry out the intent of the parties as expressed in the document by which the release is given."

Moreover, a tentative draft of the Restatement, *Second* provides that the effect of a release without express reservation of unmentioned joint tortfeasors shall be determined in accordance with the intentions of the parties. Restatement, Second, Torts § 885, Comment d (tent. draft no. 16, 1970).

Likewise, Prosser observes, with favor, the assault upon the old common law rule in favor of more inquiry into the intentions of the parties. Prosser, Torts, (3d Ed.).

8. Compania Anonima Venezolana · De Navegacion v. A. J. Perez Export Co., 5 Cir., 1962, 303 F.2d 692, 699, 1962 A.M.C. 1710, 1719, cert. denied, 1962, 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed.2d 276. See also, Texas Gulf Sulphur Co v. Blue Stack Towing Co., 5 Cir., 1963, 313 F.2d 359, 362; Hadjipateras v. Pacifica, S.A., 5 Cir., 1961, 290 F.2d 697, 1961 A.M.C. 1417.

9. As long ago as 1823, Justice Story wrote: "[Seamen] are emphatically the wards of the Admiralty; * * *. If there is any undue inequality in the terms [of their contracts], any disproportion in the bargain, any sacrifice of rights on one side, which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction, is that the bargain is unjust and unreasonable, that advantage has been taken of the situation of the weaker party, and that pro tanto the bargain ought to be set aside as inequitable. * * * And on every occasion the court expects to be satisfied, that the compensation for every material alteration is entirely adequate to the diminution of right or privilege on the part of the seaman." Harden v. Gordon, 2 Mason 541, Fed.Cas. No. 6,047, quoted in Garrett v. Moore-McCormack Co., 1942, 317 U.S. 239, 246, 63 S.Ct. 246, 251, 87 L.Ed. 239, 244.

10. That rule was laid down by the Supreme Court in Garrett v. Moore-McCormack Company, 1942, 317 U.S. 239, 248, 63 S.Ct. 246, 252, 87 L.Ed. 239, 245. "We hold, therefore, that the burden is upon one who sets up the seaman's release to show that it was executed freely, without deception or coercion, and *that it was*

If courts of admiralty can refuse to enforce an unjust release in favor of the party purportedly discharged (see, e. g., Bonici v. Standard Oil Company, 2 Cir., 1939, 103 F.2d 437), it follows that the Admiralty has like equitable latitude in declining to enforce, not the release itself, but the antiquated, unreasoned, technical rule in favor of one not even mentioned as a party.

But apart from the two factors of (i) equitable powers of the Admiralty and (ii) the vulnerability of a seaman's release, we are freed at last of this anachronistic and rigid rule of the common law—certainly in cases relating to injuries to seamen, amphibious ambiguous seamen included—by the Supreme Court's ruling in *Hazeltine* (see note 4, *supra*).

There the Court, after delineating the three rules which have emerged in cases of this kind,[11] declared that it could find no basis in Federal jurisprudence for the "ancient common law" and strictest rule, rejected the second and less severe rule (the one urged by the Government in this case) as "a trap for unwary plaintiffs' attorneys," and adopted the third and modern, sensible rule that the consequence of the release is to be determined by the intentions of the parties.[12]

While it is true that the Court was speaking immediately of statutory claims (patent and antitrust) everything said points to a like approach in Federal question claims whose policies and traditions are as readily identifiable. For maritime affairs and particularly the rights of seamen of all hues, the rights and obligations have emerged from decades of adjudication largely by Federal courts and nearly always under the compulsion of a binding maritime law. Cf. Kermarec v. Compagnie Generale Transatlantique, 1959, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550, 1959 A.M.C. 597.

Case law and a complex of Federal legislation concerning employment, and working and safety conditions reflect a commitment to the policy that allowance of money damages to those harmed by violations of these standards serves the dual purpose of (i) ameliorating the harm and (ii) encouraging others (by deterrence) to take effective preventive steps. For such cases, the *Hazeltine* approach is most consistent with the aims and purposes of the damages remedy. Likewise, an omnipresent characteristic of modern maritime litigation is its mul-

made by the seaman with full understanding of his rights." (emphasis added). See also, Superior Oil Company v. Trahan, 5 Cir., 1964, 322 F.2d 234; Harmon v. United States, 5 Cir., 1932, 59 F.2d 372, 373; Bonici v. Standard Oil Co., 2 Cir., 1939, 103 F.2d 437; Elliott v. Pacific Far East Line, 9 Cir., 1955, 230 F.2d 238.

In recognition of this policy, Congress has expressly provided that "not withstanding any release signed by any seaman under § 644 of this title, any court having jurisdiction may· upon good cause shown set aside such release and take such action as justice may require." 46 U.S.C.A. § 597.

11. The three rules identified are: (i) The ancient common-law rule that a release extinguished the cause of action to which it related, regardless of the wording or attempted reservation of rights; (ii) The First Restatement of Torts rule that a release releases all parties except those against whom rights are expressly re- served; and (iii) the Restatement Second approach that the effect of the release is governed by the intentions of the parties. 401 U.S. at 343, 91 S.Ct. at 808.

12. "A final rule which has gained support in several recent decisions and been adopted by the American Law Institute in a tentative draft of the Second Restatement of Torts, provides that the effect of a release upon coconspirators shall be determined in accordance with the intentions of the parties. See Winchester Drive-In Theatre, Inc. v. Twentieth Century-Fox Film Co., 232 F.Supp. 556, 561–563 (ND Cal.1964), rev'd. Twentieth Century-Fox Film Corp. v. Winchester Drive-In Theatre, Inc., supra; Young v. State, 455 P. 2d 889 (Alaska, 1969); Breen v. Peck, 28 N.J. 351, 146 A.2d 665 (1958); Restatement, Second, Torts § 885(1) (tent. draft no. 16, 1970); Comment 12 Vand. L.Rev. 1414, 1416–1417 (1959)." 401 U.S. at 345, 91 S.Ct. at 809.

tiparty nature.[13] Settlements with some, but not all, are frequently made— and should be even more encouraged. And for this Court to "adopt the ancient common-law rule would frustrate such partial settlements, and thereby promote litigation." 401 U.S. at 347, 91 S.Ct. at 810.

The District Judge was right when he rebelled at the sovereign invoking this ancient absurdity. Only in different words did he vary from the Supreme Court's recent declaration that the "straight-forward rule is that a party releases only those other parties whom he intends to release." 401 U.S. at 347, 91 S.Ct. at 810.

■ As a "forward looking court," see Zapata Off-Shore Co. v. M/S Bremen, 5 Cir., 1970, 428 F.2d 888, 896 (Wisdom, J., dissenting), we must be straightforward, so for us, too, this is the "rule to which we adhere." 401 U.S. at 347, 91 S.Ct. at 810.

■ In the present case, the Judge had ample basis for concluding that Cates never intended to release the United States. The day after the settlement with Reynolds was reached, Cates announced in open court that he was ready to proceed against the United States. This action is inconsistent with the notion that Cates intended to release the Government. This the Government fully understood for it moved for a continuance rather than dismissal at that time. Indeed, the Government does not, nor could it, seriously contend that Cates *in-*

*tended* to release it. What and all it asks for is that we hold Cates to consequences which the law in less enlightened days imposed. The Trial Judge was warranted in determining that the Government, asserting the release, failed to demonstrate either that (i) it satisfied maritime principles as to seamen (see note 10, *supra* and accompanying text) or (ii) that Cates intended to release all parties including the United States.[14]

## II. Warranty of Seaworthiness

The second contention of the Government relates to whether or not Cates can recover on a theory of breach of warranty of seaworthiness. This aspect of the case actually involves two distinct questions: Was Cates a "seaman" at the time of the accident, and was his injury the result of any "unseaworthy" condition created aboard the vessel of which he was in service?

The facts of this case are unique and detailed, but well set forth in the District Court's memorandum opinion. Since no useful precedential purpose would be served by recounting them, we need not detail them here.

■ Cates was injured when debarking from USS NIMBLE into a whaleboat to transport him and others to the quarters ship. The Court found unseaworthiness because of the use of the whaleboat instead of an LCM in view of excessive wind and wave action. We decline to disparage the role of the Trial Judge as the Government urges [15] to

---

13. Cf., e. g., Whisenant v. Brewster-Bartle Offshore Co., 5 Cir., 1971, 446 F.2d 394 [No. 31020, July 20, 1971]; Grigsby v. Coastal Marine Service of Texas, Inc., 5 Cir., 1969, 412 F.2d 1011, 1969 A.M.C. 1513, cert. dism'd, 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531; Burrage v. Flota Mercante Grancolombiana, S.A., 5 Cir., 1970, 431 F.2d 1229, 1970 A.M.C. 2254; Delaneuville v. Simonsen, 5 Cir., 1971, 437 F.2d 597.

14. Perhaps technically, the controlling inquiry in this case should be: Did the United States demonstrate that Cates fully understood the consequences of his release? Having upheld the conclusion

that Cates never intended to surrender his right of action against the United States, we necessarily determine, in answer to the above, that the government failed to sustain its burden to validate the release with affirmative evidence of knowledge and understanding.

15. For example, the Government strenuously claims that the waves were one to two feet, instead of four to six feet as Cates testified, and that the use of the whaleboat was proper. Ignored altogether in the Government's case is the uncontroverted testimony of the Captain of the USS NIMBLE that on the day of this accident he had received a signal from

find facts in a swearing match of over 500 pages. These facts are well above the Plimsoll mark of F.R.Civ.P. 52(a).

The Government contends that since Cates was not to render service on or to the USS NIMBLE, he was, with respect to her, neither a blue water seaman, a Robison seaman,[16] or a Sieracki-Yaka-Ryan[17] pseudo-seaman. At most, the argument plows on, he was a passenger to whom the warranty of seaworthiness does not extend.

■ We find it unnecessary to decide this matter in this very small case. For although the Judge did not expressly pass on Cates' alternative negligence count, the fact findings underlying the conclusion of unseaworthiness compel a like conclusion of negligence. This was a classic case of a maritime injury in which maritime principles are controlling. Kermarec v. Compagnie Generale Transatlantique, 1959, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550, 1959 A.M.C. 597. And to one so close to the enterprise in which USS NIMBLE, ALUMINAUT, whaleboat and Cates all played such a part, the Government owed at least the duty of care. See Massey v. Williams-McWilliams, Inc., 5 Cir., 1969, 414 F.2d 675, 1969 A.M.C. 1641.

No good would be served by a remand. Cf. Noah's Ark v. Bentley & Felton Corp., 5 Cir., 1961, 292 F.2d 437, 1961 A.M.C. 1641, on appeal following remand, Oil Screw Noah's Ark v. Bentley & Felton Corp., 1963, 322 F.2d 3, 1963 A.M.C. We carry out the Congressional mandate to ignore insubstantial errors.[18] and to enter a decree which is appropriate.[19]

### III. Flotsam and Jetsam

■ Finally, there remains the very small matter of technical adjustments to the amount of damages allowed. Both parties agree that the Trial Court erroneously assumed the settlement payment to have been $2900 rather than $2950, and accordingly the judgment is hereby reformed to show that Cates is entitled to recover $5050 from the United States instead of $5100. We hold further that the Government is not entitled to a reduction equal to the amounts paid by Reynolds specifically for maintenance and cure, including medical expenses paid by Reynolds, since there is no affirmative showing on the record that any of the $8,000 judgment duplicated the maintenance and cure and medical expense items.[20] Of course, it is

the Division Commander prohibiting use of craft smaller than an LCM, but that he purposely disregarded this order, at least with respect to an hour or so. The use of the whaleboat is admitted, so the disregard of the order is undisputed as well.

16. Offshore Co. v. Robison, 5 Cir., 1959, 266 F.2d 769, 1959 A.M.C. 2049.

17. See, e. g., Delaneuville v. Simonsen, 5 Cir., 1971, 437 F.2d 597, 598; Burrage v. Flota Mercante Grancolombiana, S.A., 5 Cir., 1970, 431 F.2d 1229, 1231, 1970 A.M.C. 2254, 2255.

18. 28 U.S.C.A. § 2111; F.R.Civ.P. 61.

19. 28 U.S.C.A. § 2106.

20. Although this issue usually arises in the context of a previous suit by the seaman against a different party, the principle of law remains the same where a prior settlement or partial payment is alleged to have satisfied the elements of damages. "What is true of a judgment is true of a release."

Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 501, 84 S.Ct. 1526, 1540, 12 L.Ed.2d 457, 477 (1964).

A seaman may well have multiple causes of action arising out of the same injury-causing event: He may have an action against his employer for maintenance and cure, which is quasi-contractual and arises inferentially out of the relation of ship and seaman. He may have a right of indemnity against the owner of the vessel for the unseaworthiness of the vessel or for Jones Act negligence. He may have a right to recover against a third party whose negligence was the proximate cause of his injury. In each of these cases the elements of damages may not be equivalent. In other words, while some of the elements of damages may overlap, a payment under the obligations to provide maintenance and cure, for example, will not necessarily satisfy all of the elements of damages allowable under the right to recover for unseaworthiness of the vessel. This Court and other jurisdictions have

good practice and sometimes required that the Judge indicate precisely what elements are being included in the judgment award.[21] But here it is on the Government to show a duplication. We are confident that this Judge who has been found so right in all he did here knew both the principles of law against double recovery and the facts regarding Cates' receipt of direct and indirect benefits.[22]

Modified and as modified affirmed.

long held that unless it is definitely shown that the elements compensated for in a previous suit, settlement, or payment have actually been included in the present suit, the seaman is not precluded from recovering in the present suit. The burden is on the one claiming duplication to show that the damages assessed against him have in fact and in actuality been previously covered in a prior settlement, payment, or judgment. See, Muise v. Abbott, D.C.Mass., 1945, 60 F.Supp. 561, 562, aff'd, 1 Cir., 1947, 160 F.2d 590; Smith v. Lykes Brothers-Ripley, 5 Cir., 1939, 105 F.2d 604; Billiot v. Sewart Seacraft,

supra; Vickers v. Tumey, 5 Cir., 1961, 290 F.2d 426, 1961 A.M.C. 1173.

21. See Vickers v. Tumey, supra; Noble v. Bank Line, Ltd., 5 Cir., 1970, 431 F.2d 520, 1970 A.M.C. 1699.

These, of course, were cases where, in a single suit by a seaman, there was a possibility of overlapping or a substantial question about excessiveness of the award.

22. The pretrial stipulation stated precisely the amounts received as maintenance and cure and the medical expenses paid by Reynolds.