**Doris Jean FISHER**

v.

**Willie DANOS, Gulf Oil Corporation, the Travelers Insurance Company.**

**Civ. A. No. 75–3447.**

United States District Court, E.D. Louisiana.

Aug. 30, 1984.

---

Robert McComiskey, Anthony Marinaro, John P. Massicot, Mark Davis, New Orleans, La., for plaintiff.

Charles Hanemann, Houma, La., for defendants Gulf Oil Corp. and Travelers Ins. Co.

Darryl W. Bubrig, Buras, La., for cross-defendant Willie Danos.

## OPINION

CASSIBRY, Senior District Judge.

Plaintiff Doris Jean Fisher brought this lawsuit to recover for injuries she sustained when a skiff on which she was a passenger struck an unlit jetty built by Gulf Oil Company. The owner of the skiff, Willie Danos, was released by compromise before trial. At trial, the jury found that Gulf was not negligent, that the negligence of Danos was seventy percent and that Fisher was thirty percent contributorily negligent. After judgment, Fisher appealed and Gulf and The Travelers Insurance Company, Gulf's insurer, cross-appealed, claiming that the compromise executed by Fisher released Gulf and Travelers as well as Danos. The Court of Appeals found that Fisher had effectively revoked her election of a jury trial and was entitled to reconsideration of her case by the court sitting without a jury. *Fisher v. Danos,* 671 F.2d 904 (5th Cir.1982). The Court of Appeals did not determine whether the compromise between Fisher and Danos also released Gulf, but remanded the entire matter for consideration on the basis of the present record uninfluenced by the jury verdict. After consideration of the record, the court now enters findings of fact and conclusions of law in support of its judgment.

## FINDINGS OF FACT

1. On the moonless evening of November 11, 1974, the plaintiff, Doris Jean Fisher, met her friend Willie Danos at a boat landing in Venice, Louisiana known as The Jump. The time was approximately 7:00 p.m. Fisher arrived at The Jump from The Den, a bar where she had spent the past several hours. During that time, she had had at least two drinks of an alcoholic content. Fisher carried with her from the bar several bottles of liquor and mixers.

2. Willie Danos was the owner of a twenty-foot, open Lafitte skiff, the M/V ROADRUNNER II. This skiff was powered by an Evinrude outboard motor capable of attaining speeds of 25 miles per hour or faster.

3. Fisher and Danos left The Jump in the M/V ROADRUNNER II shortly after 7:00 p.m. The purpose of their trip was to bring the liquor to friends who were fishing some distance away. Danos had also had two or three drinks earlier in the afternoon, but neither party consumed any of the alcohol they brought with them after leaving The Jump.

4. During the course of their brief excursion, Danos was standing at the wheel amidships and operating the skiff. Fisher was seated on a small ice chest just forward of Danos and was facing him.

5. The pair traveled in a generally easterly direction from The Jump on the Mississippi River through the Baptiste Collette Bayou and on into Denesse or Dennis Pass. Dennis Pass is a navigable waterway leading to the Gulf of Mexico.

6. Danos was piloting the M/V ROADRUNNER II through Dennis Pass at 25 miles per hour or more at the time of the accident. Roughly fifteen minutes after its departure from The Jump, the M/V ROADRUNNER II struck the channel end of a wind dam jetty with sufficient force to stove in its bow. As a result of the collision, Fisher suffered multiple fractures, a loss of consciousness and great pain. Danos pulled her from the bow and obtained emergency medical attention for her.

7. The jetty struck by Danos was one of a series of five timber wind dam jetties which run perpendicular to the right descending or southern bank of Dennis Pass in between Gulf's South Grand Bay warehouse and its nearby compressor station. The width of the pass in this area is approximately 200 feet from shore to shore. The jetties protrude into the channel from 50 to 80 feet.

8. At the time of the accident, the jetties were covered with creosote and were of a dark hue. The jetties, at normal water levels, stand four feet above the level of the water. None of the jetties were marked, at the time of the accident, by any lights, reflectors, or other device to illuminate or warn of their presence. Any reflecting tape they had once had was old, faded and ineffective.

9. The jetties were designed and built to divert water into the center of the channel and thereby function as a form of erosion control to protect Gulf's compressor station and other installations in the vicinity. The jetties were owned by Gulf and were constructed over a period of approximately two months in mid-1967 under the supervision of Gulf's area production superintendent, R.E. Valentine. Although a work order of the J. Ray McDermott Company ("McDermott") dated November 22, 1969 refers to the job as "building wind jams", the jetties were actually completed in 1967. Only thirteen hours were expended by McDermott's work crew on the job described as "building wind dams". It is obvious that the five jetties in question could not have been built in such a short time. Each jetty was at least fifty feet long, built of wood planking and braced by pilings sunk in water at least fifteen feet deep. In light of the relatively small amount of time spent on this work order, I conclude that it refers to the repairs made to the jetties in the wake of Hurricane Camille. Moreover, the testimony of Danos and other trial witnesses uniformly indicated that the jetties were completed before December of 1968.

10. Gulf never obtained a permit from the Army Corps of Engineers authorizing the construction of these jetties as required by the Rivers and Harbors Appropriation Act of 1899, 33 U.S. § 403.

11. Danos was an experienced crewboat operator who had traveled through Dennis Pass more times than he cared to count. Danos knew of the jetties' existence and had traveled through Dennis Pass at night on several occasions. On the evening of the accident, Danos was hugging the right or southern bank of Dennis Pass and making occasional use of a hand-held spotlight to ascertain his distance from the bank. He successfully navigated past the first two jetties, each about 50 feet long. Danos then turned the skiff to angle it past the third and longest jetty. This jetty protrudes approximately 80 feet into the channel and the M/V ROADRUNNER II struck it near its channel end.

12. Willie Danos had actual knowledge of the presence of the jetties in Dennis Pass and, in the exercise of reasonable care, he should have proceeded more cautiously to insure the safety of his passenger. I find 25 miles per hour to have been an unreasonable speed for travel in the darkness of Dennis Pass. I therefore find that Danos failed to exercise reasonable care and that this failure constituted negligence on his part. Danos' negligence was a proximate cause of the collision with the jetty and Fisher's injuries and damages.

13. The jetty Danos struck was unmarked and unlit. Even someone familiar with the Pass as Danos was could not spot the jetty in the dark. Gulf built and maintained the jetty and could have foreseen that it could present a hazard to navigation to a vessel traveling in the dark, at any speed. Gulf was at all times capable of installing a light on the jetty and it could have done so at minimal expense. The jetty Danos struck protruded far out into the channel and, without a light or other device to warn river traffic away from it, the jetty constituted a hazard to navigation. Gulf's failure to take reasonable steps to mark the jetty constituted negligence and was a proximate cause of the collision and the injuries and damages suffered by the plaintiff.

14. Danos and Gulf were equally responsible for Fisher's injuries.

15. Fisher also bears some of the responsibility for her accident. She accompanied Danos on the trip and they had both been drinking. Her conduct on the trip also distracted Danos while he was operating the skiff. She should have used more caution in riding with Danos in his condi-

tion. I therefore find that her negligence contributed to the accident and also constituted a proximate cause of her injuries. I fix her contributory negligence at twenty-five percent.

16. In the accident, Fisher sustained injuries consisting of an open fracture of the right leg between the knee and ankle, and an extremely comminuted fracture of the left leg and hip. She also suffered a fractured collar bone and multiple abrasions. Her right leg was placed in a cast, but the fractures to her left leg required surgery. A pin and nail plate were inserted to repair the fractures to her left leg and hip. In the process of knitting together, Fisher's left leg came to be one and a half inches shorter than her right. Fisher attempted to meliorate the effects of the discrepancy in a number of ways. She used heel lifts and altered her gait but to no avail.

17. Suffering from persistent pain and embarrassment over the unequal length of her limbs, Fisher chose to undergo corrective surgery. In December of 1978, she returned to the hospital for surgery to shorten her longer leg by removing a portion of her left femur. This surgery gave her legs of equal length, but left them assymetrical in that her knees were now of unequal height. In addition, Fisher was left with metal implants in her left leg and severe scarring. Fisher is unable to run and cannot walk without discomfort. She suffers from persistent pain and is subject to an increased risk of degenerative arthritis in the affected joints. In sum, the accident has resulted in a thirteen percent partial permanent disability of her body as a whole.

18. At the time of the April 1980 trial, Fisher's life expectancy was forty-three years and her work-life expectancy was twenty-six years.

19. The mother of six children at the time of trial, Fisher had a record of sporadic employment as a waitress and barmaid. She had never progressed past the eighth grade and her abilities in the three R's had declined measurably below that grade level. Neither her education nor her job skills suggest Fisher would be likely to advance to more remunerative employment than that in which she was engaged at the time of the accident. At that time, she was a barmaid at The Den and her earnings were in the neighborhood of $165.00 per week.

20. Fisher attempted on more than one occasion to return to her job as a barmaid following her accident, but was unable to continue due to the pain in her legs. It is likely that she will be unable to return to work in the future given the condition of her limbs.

21. Fisher has suffered total damages in the amount of $200,000.00 before deducting for her own negligence.

22. On February 28, 1975, Fisher executed a release in favor of Danos "which does expressly release and forever discharge the said Willie Danos and all other persons from any and all claims for damages arising out of or in any way connected with the boating accident." Despite the use of the phrase "all other persons", the intent of the February 28, 1975 agreement was to release Willie Danos only and not to release either Gulf or Travelers. The release made no mention of Gulf or Travelers. Gulf and Travelers were not present at the execution of the agreement and did not contribute any sums to either Fisher or Danos as part of this or any other settlement. Fisher and Danos did not discuss releasing Gulf during their settlement negotiations. Fisher was not represented by counsel at the time she executed the release and given the low level of her reading skills and education, she cannot be found to have also intended to release absent parties. To the contrary, Fisher's intention was to settle with Danos and proceed against Gulf.

23. Subsequent to the filing of this action, Fisher executed a second release, dated August 10, 1976, in favor of Willie Danos. This agreement was reached after Danos had failed to honor his obligations under the first release. This agreement supplanted the parties' former agreement. In contrast to the earlier agreement, Fisher made this release "with a full reservation

by me of any and all rights which I may have against the Gulf Oil Corporation." Pursuant to the release, on August 25, 1976, the Court entered an order dismissing Fisher's claim against defendant Willie Danos.

## CONCLUSIONS OF LAW

1. The court has jurisdiction over this matter pursuant to its admiralty jurisdiction. 28 U.S.C. § 1333; F.R.Civ.P. 9(h); *Fisher,* 671 F.2d at 906.

2. Gulf and Travelers have contended throughout this lawsuit that the release executed by Fisher on February 28, 1975 in favor of Danos "and all other persons" was effective to release them from any liability that they might have to Fisher as a result of her accident. In an admiralty case, the effect of a release should be determined in accordance with principles of federal law. *See Ingram Corp. v. J. Ray McDermott & Co., Inc.,* 698 F.2d 1295, 1317 n. 27 (5th Cir.1983). The federal rule in this regard is well established. A release of one joint tortfeasor is not a release of others unless the party signing the release intended the others to be released. *Locafrance U.S. Corp. v. Intermodal Systems Leas.,* 558 F.2d 1113, 1115 (2nd Cir. 1977) (citations omitted).

3. The effect of this release, therefore, is to be determined by the intentions of the parties. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 347, 91 S.Ct. 795, 810, 28 L.Ed.2d 77 (1971); *Cates v. United States,* 451 F.2d 411, 415 (5th Cir.1971). Seamen are wards of the admiralty court and their releases merit close scrutiny. The burden rests on the party seeking to use a seaman's release as a defense to show that it was given with an informed understanding of his rights and a full appreciation of the consequences. *Cates,* 451 F.2d at 414. Although Fisher is not a seaman, her release also merits careful scrutiny. Because of her lack of education and legal sophistication, comprehension of the legal consequences of a document she could not even read cannot be imputed to Fisher. *See Locafrance,* 558 F.2d at 1114 (in a personal injury case, questions regarding the intent of the parties may arise even when a release is unambiguous on its face).

4. Determination of the intentions of the parties is a question of fact. I have found that Fisher did not intend to release Gulf or Travelers when she executed the release agreement of February 28, 1975. There was never any bargaining between the parties because Gulf and Travelers had no contact with Fisher in connection with this release. Absent evidence to the contrary, a release of a settling tortfeasor is not effective to release an absent non-participating, non-settling tortfeasor. Therefore, the failure of the first release to include an express reservation of Fisher's rights against Gulf and Travelers is of no moment. Gulf and Travelers cannot rely on the first release as a defense to their liability to Fisher.

5. Section 10 of the Rivers and Harbors Appropriation Act of 1899 ("the Act") mandates that express authorization be obtained for the creation of any obstruction to a navigable waterway of the United States.[1] 33 U.S.C. § 403. There is no question that the statute applies to the jetties Gulf built in Dennis Pass. It is also clear that Gulf never sought or obtained the requisite permit from the Army Corps of Engineers for these jetties.

6. Instead, Gulf has contended that its failure to comply with the statute is excused by the grandfather clause contained in 33 C.F.R. § 322.4(g) (1981). The regulation provides that no section 10 permit is required for "structures or work completed before 18 December 1968 or in waterbodies

---

1. The statute provides as follows:

    The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any ... jetty ... in any ... navigable river ... except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army.

over which the District Engineer has not asserted jurisdiction provided there is no interference with navigation." Although the jetties were completed before the December 1968 cut-off date, they were a hazard to navigation. The jetties, particularly the one struck by the M/V ROADRUNNER II, obstructed a substantial portion of the channel, lay low in the water, and could not be readily identified in the dark. Thus, the grandfather clause is inapplicable to these jetties and Gulf's failure to comply with the statutory permit requirement is not excused.

7. One of the purposes of the Act is the protection of navigable waterways from encroachment and obstruction in order to promote the safety of navigation. *See, e.g., Atlantic Refining Co. v. Moller,* 320 U.S. 462, 466, 64 S.Ct. 225, 227, 88 L.Ed. 168 (1943). The permit requirement of section 10 of the Act imposed a specific duty on Gulf for the protection of a class of which Fisher was a member. Although Fisher contends for the application of a strict rule of negligence *per se* for Gulf's failure to comply with the statute, all that is established is a standard by which the fact of negligence may be determined and liability imposed for injuries of the character which the statute was designed to prevent. *See* Prosser, Handbook of the Law of Torts 200 (4th ed. 1971).

8. The Army Corp of Engineers has no requirements of its own with respect to lighting. Instead, a section 10 permit contains the condition that any structures authorized by it be marked or lighted as required by the Coast Guard. Coast Guard regulations call for the placement of obstruction lights with a 360° lens on any structure over 50 feet long. 33 C.F.R. § 67.05–1(c) (1983).[2] None of the jetties had such lights. Inasmuch as the jetties protruded into navigable waters, Gulf had a duty to install lights to mark the jetties. *Gele v. Chevron Oil Co.,* 574 F.2d 243, 247 (5th Cir.1978).

9. Gulf's failure to meet its statutory duties and either mark or light the jetties brings on the Rule of *The Pennsylvania,* 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874). *Gele,* 574 F.2d at 247. Under the Rule, the burden is on Gulf to show not merely that its fault might not have been one of the causes, or that it probably was not, but that its violation of these rules intended to prevent collisions could not have been a cause of the collision. *Id.* (citations omitted). This is obviously a difficult burden to meet and Gulf has not been able to overcome it. Gulf has not shown that, by all reasonable probabilities, its failure to light the jetty did not contribute to the cause of the collision. *Id.*

10. Even were the Rule of *The Pennsylvania* not applicable, we would have no difficulty in concluding that Fisher had shown, by a preponderance of the evidence, that Gulf's failure to light its jetties was negligence and a proximate cause of the accident. With the exception of the jetties, Gulf had lights on each and every structure it had placed in the channel of Dennis Pass or along its banks. The jetties were entirely under Gulf's control and the task of adding lights to them would have been a simple one involving minimal expenditures of time and money. Even if Coast Guard permission were required for the installation of obstruction lights, there is nothing to indicate permission would not have been readily granted. *See* 14 U.S.C. § 83.

11. Danos, as the captain and operator of the M/V ROADRUNNER II, owed his passenger a duty to exercise reasoable care for her safety. Despite his knowledge of the existence of the jetties, he was traveling along the bank at full speed on a dark and moonless night. His operation of the skiff at high speed under these conditions was dangerous and unreasonable. His negligence was a proximate cause of the

**2.** The regulations provide, in pertinent part:
(c) Structures having a horizontal dimension of over 50 feet on any one side, or in diameter, shall be required to have an obstruction light on each corner ... or as prescribed by the District Commander, each light to have a 360° lens.

collision with the jetty and the resulting injuries and damages suffered by Fisher.

12. Fisher's contributory negligence was also a proximate cause of the accident and her resulting injuries.

13. At the time of trial, an award of future lost earnings was governed by *Johnson v. Penrod Drilling Co.*, 510 F.2d 234 (5th Cir.), *cert. denied*, 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58 (1975). Accordingly, the court permitted no proof, argument, or jury instructions concerning inflationary factors to be considered or used at trial. In the years since this suit was first tried, of course, the law regarding the calculation of future lost earnings has endured considerable upheaval. *Penrod* was first overruled by *Culver I*. *Culver v. Slater Boat Co.*, 688 F.2d 280 (5th Cir.1982) (en banc). Thereafter, the Supreme Court decided *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983), and the Fifth Circuit undertook to reconsider *Culver I* in light of *Pfeifer*. In *Culver II*, the Fifth Circuit adopted the below-market-discount method for use in calculation of future lost earnings. *Culver v. Slater Boat Co.*, 722 F.2d 114 (5th Cir. 1983) (en banc).

The question remains, however, whether this case is now governed by *Culver II*. The Fifth Circuit recently delineated the categories of cases governed by *Penrod, Culver I,* and *Culver II,* respectively. *Martin v. Missouri Pacific R. Co.*, 732 F.2d 435 (5th Cir.1984). As was true of *Martin,* the instant case was tried prior to the Fifth Circuit's decision in *Culver I,* but the plaintiff objected to the application of *Penrod's* principles. Thus, *Penrod* is not applicable. Relying on *Penrod,* the court submitted the case to the jury without consideration of the inflation adjustments approved in *Culver I*. Since this case falls within neither of the first two categories delineated in *Martin,* it comes under the third category which covers all other cases in which the inflation-discount issues were raised in the district court. *Culver II* is applicable to cases in *Martin's* third category and would ordinarily apply here. *Martin,* 732 F.2d at 436.

There is a problem with applying *Culver II* to this case, however. The Fifth Circuit instructed the court to decide the case on the basis of the record made before the jury. That record, however, is insufficient to permit the calculation of future lost income in accordance with *Culver II*. Plaintiff's evidence of future lost earnings was presented by her expert economist in accordance with the then-applicable law.[3] In order to arrive at an award for future lost income, any calculation of future lost earnings would have to be made in accordance with the below-market discount rate method mandated by *Culver II*.[4] There appear, however, to be as many methods of calculating an award of future lost earnings under *Culver II* as there are economists

---

**3.** Fisher's future lost earnings were calculated to total $200,000.00. This figure represents an annual after-tax income of $8,000.00 for 25 years. Plaintiff's expert chose two different discount rates to arrive at a figure representing the present value of Fisher's total future lost earnings. Discounting at the rate of 5% yielded a present value amount of $114,900.00; discounting at the rate of 7.5% yielded a present value figure of $90,300.00.

In order to arrive at these figures, plaintiff's expert assumed that Fisher would work full-time into the 21st century. In light of plaintiff's prior employment history, family situation, and the failure of her income tax returns to support these assumptions of full and regular employment, the court is unable to accept the income stream calculated by her expert. In the court's view, her expert's calculation of future lost earn-

ings exaggerates Fisher's future lost income by a factor of four.

**4.** If the court were to estimate future lost earnings in accordance with *Culver II*, it would apply a below-market discount rate of 2%. Excepting price inflation, societal factors are unlikely to push Fisher's future wages up. Consideration of her individual skills and resources leads the court to conclude that she would not achieve any real wage growth. We would, therefore, merely set off an estimate of future price inflation against the market interest rate to arrive at the pre-tax below-market-discount rate. Only a minimal adjustment, if any, would be required for tax effects since Fisher's earnings leave her in a bracket only slightly above minimum wage levels. *See Culver II,* 722 F.2d at 118, 122; *Culver I,* 688 F.2d at 296; *Pfeiffer,* 103 S.Ct. at 2556.

available to perform the calculation. *See, e.g.,* Wolfson, *Wright v. ODECO: State Court Economic Evaluation of Maritime Personal Injury Claims,* The Trial Brief, July 1984 (Special Supplement) at 1, 4. Even were the court to direct the calculation to be made in accordance with a below-market rate fixed by the court, further proceedings would be necessary to allow the method of calculation to be tested on cross-examination. Thus, compliance with *Culver II* appears to require the court to go beyond the present record in disregard of the mandate of the Court of Appeals.

Thus, the court finds itself able to apply the law of this circuit only at the risk of violating the Court of Appeals' explicit instructions on remand. In an effort to avoid this particular Scylla and Charybdis, we have chosen to make an award of general damages. An award of general damages is especially appropriate in a case such as this where the record supports an award of $200,000.00 for pain and suffering alone. Most, if not all, of Fisher's damages are attributable to her physical injuries and her attendant pain and suffering, both physical and emotional. The proof of her lost income, past and future, is considerably weaker.[5] As the Court of Appeals recognized, its remand "for a trial by the trial judge on the basis of the record made before the jury" placed this case in "peculiar circumstances." These peculiar circumstances are most evident with respect to the calculation of future lost earnings.

This accident took place ten years ago. The voyage of this case through the courts has been a long one and it is time to bring it to a close. It would be unfortunate and unjust to delay Doris Jean Fisher's recovery yet again as a result of the peculiar circumstances of this case.

14. Fisher bears twenty-five percent of the responsibility for the accident. Therefore, her total damages have been reduced from $200,000.00 to $150,000.00. Her recovery from Gulf and Travelers, moreover, is reduced further to account for the compromise she entered into with Danos. As a result of this compromise, Fisher is entitled to recovery limited to the proportional share of the damages attributed to Gulf's comparative negligence. *United States v. Reliable Transfer Co.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). Danos and Gulf have been found equally responsible for Fisher's injuries. Judgment shall, therefore, be entered in favor of plaintiff and against Gulf and Travelers, *in solido,* in the sum of $75,-000.00, with interest and costs as taxed by the Clerk of Court.[6]

15. Gulf's sole remedy on its cross-claim against Danos for contribution and indemnification is reduction of Fisher's recovery in accordance with the apportionment of liability between Danos and Gulf. *Reliance Transfer,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251; *Leger v. Drilling Well Control, Inc.,* 592 F.2d 1246, 1249 (5th Cir.1979). No right to indemnity arises here, either by agreement between the parties or by operation of law. Gulf, therefore, is not entitled to indemnification from Danos. *Gele,* 574 F.2d at 251.

---

**5.** The testimony adduced at trial represented Fisher's lost earnings to have reached $10,-800.00. This figure was calculated on the basis of earnings of $165.00 per week from December 1978 to the time of trial with an appropriate deduction for taxes. No evidence was presented upon which to base a calculation of lost earnings for the period from the time of the accident to December 1978. For the reasons noted above, even the figure of $10,800.00 is open to question. *See,* note 3, *supra.*

**6.** Admiralty courts have discretion in setting the rate of pre-judgment interest. *In re M/V VULCAN,* 553 F.2d 489, 491 (5th Cir.1977). In view of the yields available to investors over the past decade, pre-judgment interest shall run from the date of judicial demand at the rate of eleven percent per annum.